80 N.J. Super. 148 (1963)
193 A.2d 255
MARGARET RUTH LEWIS, AN INFANT, BY HER GUARDIAN AD LITEM, WILLIAM LEWIS; WILLIAM LEWIS, INDIVIDUALLY, AND FRANCES LEWIS, PLAINTIFFS-RESPONDENTS,
v.
JESSIE D. READ; ST. BARNABAS MEDICAL CENTER, DEFENDANTS-APPELLANTS, AND MILTON PRYSTOWSKY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1963.
Decided June 26, 1963.
*152 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. William P. Braun argued the cause for appellant Jessie D. Read (Messrs. Braun & Hoey, attorneys; Mr. Mark F. Hughes, Jr., of counsel).
Mr. Joseph A. Clarken, Jr., argued the cause for appellant St. Barnabas Medical Center (Messrs. Mead, Gleeson, Hansen & Pantages, attorneys; Mr. Clarken, of counsel and on the brief).
Mrs. Annamay T. Sheppard argued the cause for respondents (Mr. William O. Barnes, Jr., attorney; Mr. Barnes and Mrs. Sheppard, of counsel and on the brief).
*153 The opinion of the court was delivered by LEWIS, J.A.D.
This is an obstetrical malpractice case which resulted in a unanimous jury verdict awarding $175,000 to the infant plaintiff Margaret Ruth Lewis (herein child, infant or baby Margaret) against defendants "(Dr.) Jessie D. Read" (herein Dr. Read) and "The Hospital of St. Barnabas" (herein hospital), and $75,000 in favor of the infant's parents, William Lewis and Frances Lewis, against the defendant Dr. Read only, and a verdict of no cause of action in favor of the codefendant "(Dr.) Milton Prystowsky" (herein Dr. Prystowsky). In denying motions for a new trial, the judge opined, "For the Jury to have found otherwise would, in my opinion, have constituted a miscarriage of justice." Defendants Dr. Read and the hospital appeal.
The infant plaintiff has suffered an impairment of the central nervous system, including the brain. She is blind, deaf, unable to speak, without sense of touch or muscular control, subject to twitching and convulsive seizures, substantially underweight, and unable to consume food except through an eyedropper or teakettle-type cup. The crucial and primary question before the jury was whether her condition of abnormality was caused by defendants' negligence or was the result of a congenital infirmity existing in utero at the time of nativity.
We note in limine that plaintiffs' initial pleading was a complaint in the Superior Court, Law Division, against Dr. Read, and that successively amended complaints were filed to join the hospital and Dr. Prystowsky as defendants. The hospital, by its answer, denied liability, pleaded separate affirmative defenses and cross-claimed against Dr. Read, and by its amended answer additionally pleaded charitable immunity under N.J.S.A. 16:1-48. Dr. Read's answers joined issue with the complaint, the amended complaints and the cross-claim. The pleadings on behalf of the hospital were filed by its then independent counsel. Prior to the pretrial conferences, however, Dr. Read's attorneys were substituted as counsel to also represent the hospital, and the latter's crossclaim *154 against the former was thereafter withdrawn. During the course of the trial, the amended complaints representing the derivative suits of the parents against the hospital and Dr. Prystowsky, respectively, having been barred by the statute of limitations, were on appropriate motion eliminated. The hospital's counsel appearing before this court were substituted after the entry of judgment and the filing of the notices of appeal. Separate briefs in extenso were filed on behalf of Dr. Read and the hospital.
The several grounds for appeal assigned by the defendants may, in substance, be summarized and categorized as follows:
 The verdict was against the weight of the evidence. It was so far contrary to the quantitative and qualitative proofs in favor of the defendants, and the amounts thereof were so excessive, that a conclusion of resultant mistake, partiality, prejudice or passion is inescapable. The trial court accordingly abused its discretion in denying defendants' motion for a new trial.
 Plaintiffs' expert witness was not qualified in the field of obstetrics to testify as to the applicable standards of medical care and the alleged deviations therefrom; consequently, prejudicial harm was committed in permitting his testimony as an expert.
 Numerous trial errors, in the segregate and aggregate, deprived defendants of a fair trial.
In approaching the resolution of those contentions, we shall in sequence consider: (1) a chronicle of basic facts which stand essentially unrefuted in the record; (2) the area of conflict, aside from the testimony of the expert witnesses; (3) evidence proffered by the medical specialists; (4) the issue of liability; and (5) the question of damages.

I.
Plaintiff Frances Lewis was 45 years of age at the time of trial. She was the mother of five children, three born prior to and one after the birth of baby Margaret, and all except the *155 latter have enjoyed "excellent health." While pregnant with Margaret, the mother, in addition to the discharge of usual family responsibilities, pursued her musical career, including the daily rendering of violin lessons. Aside from a mild peripheral neuritis, "secondary to changes of pregnancy," her prenatal interval was relatively uneventful. The obstetric services and advice of Dr. Read and her associates Dr. John McGeary and Dr. Daniel G. Jarvis (sometimes referred to as "The Trio") were rendered to Mrs. Lewis commencing in May 1955.
On or about noontime on January 25, 1956 the mother experienced the onset of mild labor pains and Dr. Read was notified. Mrs. Lewis was taken to the hospital by her husband and was admitted, about 1:45 P.M., to the "labor floor" by nurse Lena Blessing. A telephone call was relayed to Dr. Read by nurse Catherine M. Roche (in charge of the delivery room). Dr. Bausch, an intern, proceeded with a routine predelivery examination of the mother.
Nurse Laura Wogisch (hereafter Wogisch) came on duty at 3 P.M. (to relieve nurses Roche and Blessing, whose shifts of duty on that day were from 7 A.M. to 3:30 P.M.). Upon the arrival of Wogisch, Mrs. Lewis was experiencing uterine contractions at five-minute intervals, progressively "becoming stronger." The membranes ruptured shortly thereafter. Dr. Read appeared at the hospital at approximately "a quarter to four," reviewed the results of the intern's examination, and then proceeded to see Mrs. Lewis who was at that time in the labor cubicle. The expectant mother's general condition was "good" and "she was in active labor, near the time to deliver." The patient was moved into the adjoining room for delivery "around four o'clock." Sedation had not been given to the mother pursuant to her request for natural childbirth (as was the case with her prior three children), and a notation to that effect was made in the ante-partum record furnished to the hospital by the obstetrical "Trio." Dr. Read, however, had given standing orders for sedation, and an unpleasant discourse ensued between her and nurse Roche because the *156 instructions had not been carried out. The doctor, in referring to Mrs. Lewis, reacted with the exclamation: "One of those multi-para so-and so's [profane word] that like to make noise."
For a better understanding of relevant testimony, we briefly mention the physical layout and facilities of the delivery room. The area is rectangular in shape and the delivery table, with appropriate accessories, was stationed in the center of the room. The additional equipment included an anesthesia machine, an E&J resuscitator, an air lock machine, a crib (heated by light bulb under mattress), an instrument table, two other small tables, and a wall clock. It is clear from the photographic exhibits admitted in evidence that two windows are recessed in the tile wall of the room to the right of the entrance and under each window is a flat-top radiator covered by white cloth. Between the radiators and extending along the same wall, opposite to and paralleling the right side of the delivery table, are two flat-top tables, also covered by white cloth material. The surface of the aforesaid wall tables vary in height and are slightly higher than the tops of the radiators. The distance between the small tables and the delivery table was estimated to be four feet.
When Mrs. Lewis was transferred from the stretcher to the delivery table, she was made ready for delivery. Dr. Read performed the catheterization. The medical complement in the room at that time was Wogisch, a circulating nurse, Dr. Abdul Islami, the acting anesthetist (also house physician), an intern Dr. Bausch, and the defendant Dr. Read. The latter two doctors had been "scrubbed," gloved and gowned, and were positioned within the sterile field.
When Dr. Islami announced that the patient was not under sedation, Dr. Read allegedly replied, "This one likes to make noise." The mother cried out as the antiseptic (Zepheran) swab was applied, whereupon the anesthetist administered to her, through a face mask, "some laughing gas" (oxygen and nitrous oxide). During the final three uterine contraction pains (a minute apart) immediately preceding *157 the delivery expulsion, the patient intermittently inhaled additional gas, "three or four whiffs," which according to Dr. Islami usually last "five or ten seconds" each. Its effect was analgesic, causing relaxation and insensitivity to pain; she was not given an anesthetic to produce sleep or loss of sensation. The depositional testimony of Dr. Read as to the mother's condition at the time is significant:
"QUESTION: Now, when the gas oxygen ceased to be administered and the baby was delivered, was Mrs. Lewis, in your opinion, rational?
ANSWER: May I have a definition of rational?
QUESTION: Yes. Did she know what was going on around her and could she converse normally?
ANSWER: She was rational."
Baby Margaret was born at 4:14 P.M. She weighed 6 pounds 10 1/2 ounces. The birth was spontaneous following two and a quarter hours of childbirth labor culminating a normal 40 weeks' gestation period. It was not necessary for Dr. Read to use forceps or to perform an episiotomy (surgical cutting of the vulva). There was a vertex emergence from the vaginal canal and the position of presentation was identified as L.O.A. (left occipito-anterior).
After milking the baby's trachea, Dr. Read placed her upon the mother's abdomen, drained the umbilical cord, applied suitable clamps and completed a severance. The newborn was then displayed to the mother (approximately three minutes after birth). Dr. Read admitted: "I said to Mrs. Lewis that she had a nice, vigorous, healthy baby." Dr. Islami stated: "She sure has a healthy set of lungs. If all babies were born like this we doctors would have no trouble." The reputed comment of Dr. Bausch was, "she is fine." The placenta was expressed at 4:19 P.M. Dr. Islami and Dr. Bausch left the room "anywhere within the first ten or fifteen minutes" thereafter. Shortly before 5 P.M. the child was wrapped in a receiving blanket and carried by Wogisch upstairs to the nursery. There is conflicting testimony as to what transpired during the previous 45 minutes (to be *158 discussed later). Before leaving the delivery room, however, the child was cyanotic  variously characterized as "blue," "deep blue," and "blue-black." It was not refuted by any of the medical testimony elicited at the trial that baby Margaret was abnormal when she was sent to the nursery. It is equally clear from the medical evidence that a baby is cyanotic immediately upon birth but after the first few breaths of life the "blueness" diminishes and the normal child starts to turn pink in color.
Dr. Read, following a conversation with the mother (approximately 5 P.M.), made a phone call to Dr. Prystowsky (pediatrician), who in testifying as to the substance of that communication said he was informed the baby was in an incubator and was receiving six liters of oxygen per minute and that "she [Dr. Read] did not feel there was an emergency to be there at that moment, but she [Dr. Read] would like me to drop by the hospital the first opportunity I had." At approximately 5:30 P.M. Mr. Lewis telephoned Dr. Read at her residence and was advised by the doctor that he "had a baby girl and that she had turned blue shortly after she was born." (Emphasis supplied)
Dr. Prystowsky examined the infant at the hospital at 10:30 that night and signed a notation embracing the following impression:
"healthy newborn probably to be observed however for the next few days. Watch for congenital heart disease. Cyanossis could have been due to unexpanded lungs at birth or mucus."
That statement appears as a footnote to the hospital's newborn physical examination report (required to be completed within 24 hours after birth) bearing the apparent signature of Dr. Bausch, in which the infant's color was noted as "cyanotic," skin described as "normal," deformities or anomalies "none," and congenital abnormalities reported "none."
There was also admitted in evidence a log book (form approved by the Committee on Maternal Welfare Medical Society of New Jersey, entitled "Maternity Service Records") *159 representing a period from January 1, 1956 to July 31, 1956. Opposite the mother's name (Frances Lewis) and the date (January 25, 1956), there is furnished a maternity record of unchallenged factual data. It is significant, however, that in the column for the noting of "Ante-Partum Complications" nothing is listed, and in the section for "Intra-Partum Complications and Procedures" the word "normal" is inserted; and in the divisional column respecting the baby there is no statement in the blank space provided for information as to "Congenital Abnormalities, Birth Injuries and Post-Natal Complications." Dr. Read's name appears therein as the attending physician. The obstretrical supervisor was not produced as a witness, and no effort was made by Dr. Read or by anyone else to explain either the entries or the nonentries exposed in that official record of the hospital.
The child progressed with seeming improvement until January 28, 1956, when she took a turn for the worse and was put on the critical list. There is an apparent hiatus in the hospital records in that no recordings or entries are disclosed respecting the infant from 6 P.M. Friday, January 27, to 8 A.M. Saturday, January 28. On February 12, 1956 Dr. Edward P. Duffy, Jr. (chief of hospital's pediatric staff) signed an order discharging the baby in the care of Dr. Daniel C. Hackett, a pediatrician, who had previously (January 30, 1956) seen the child at the hospital, at which time his diagnosis was "Question mark neonatal sepsis * * *." Subsequently, pursuant to medical advice, the parents arranged for an examination of baby Margaret at the Children's Medical Center at Boston, Massachusetts, where she was hospitalized five days, commencing June 25, 1956. The summary of that institution was "mental retardation of unknown etiology umbilical hernia, small."
On March 2, 1957 the invalid child was admitted to the John E. Runnells Hospital for Chest Diseases (formerly Bonnie Burn Sanatorium and here referred to as Runnells Hospital), where she has been continuously institutionalized since that date. In the report of John E. Runnells, M.D., *160 examining physician, the "Stage of Disease on Admission" was stated to be "Brain damage due to severe anoxia."
We find it unnecessary for the purpose of this opinion to further narrate the incidents and developments occurring after January 25, 1956.

II.
In detailing the crucial facts, the testimony of Mrs. Lewis portrayed the following:
 The labor and delivery rooms were cold. Nurse Wogisch was attired in an "outside white coat" and nurses Roche and Blessing were wearing sweaters. Her request, while in the labor room, for a blanket was refused by Wogisch with the comment, "Yes, it is cold but we cannot give you one now. After the baby." She overheard a conversation between Wogisch and an aide, "One day its hot and one day its cold."
 The baby was a "new born pink" when she was first shown to her and in response to her question "Is she perfect," Dr. Read replied, "Well she looks and sounds it." The doctor, after remarking "Let's get the afterbirth," placed the naked child "on the table" which was "alongside of me. * * * to my right." It was abandoned there "completely uncovered" for a period of five minutes. That area along the wall was described as "counters or shelves * * * a continuous table like you have in your kitchen." There was evidence that the finger-footprinting supplies were kept in that general location.
 While the nurse was taking her thumb print, she (Mrs. Lewis) said "everything is so quiet. Is everything all right?" Dr. Read inquired about the footprinting of the baby to which Wogisch responded, "I am going to footprint her now. I will look at her." Upon turning toward the table the nurse called the doctor, and the child "still naked" was then placed in the bassinet. Upon hearing a resuscitator, "I said, you are using oxygen. What happened to my baby?" Dr. *161 Read spoke: "Oh, you mothers that won't take anything when you have your babies. You know when something happens the minute it happens. Well, I don't know what happened to your baby. But she is not turning nice and pink again the way she ought to." The following interrogation is pertinent:
"Q. What did you say? A. I said I am not going to stay nice and pink either. It is freezing cold in here. Will you please get a blanket.
Q. Who spoke next? A. Dr. Read.
Q. And what did she say? A. She said, `Is she still yelling for a blanket? Well, go get her one.' * * *
Q. What did you see Dr. Read do as to the baby? A. I saw her giving the baby oxygen and the baby fought.
Q. What did you see? A. I saw the baby's hand come up and I saw her slap the funnel off her face. She slapped the funnel off her face.
Q. What else did you see at that moment? A. I heard the baby scream.
Q. What else? A. The baby's scream was heart-rendering and I said to please stop forcing that oxygen. You are going to damage her brain.
Q. Who spoke next? A. And Dr. Read said, `I am not giving her blind oxygen, but you might as well know, Frances, this baby absolutely will not live. She has a congenital malformed heart.'"
 After nurse Wogisch was instructed to take the baby to the nursery, the mother noticed Dr. Read at a desk in the foyer, within vision and hearing distance, making a telephone call and heard her say, "I am coming home now. I want to get started before the five o'clock traffic." This was not denied by Dr. Read. When Dr. Read re-entered the delivery room, she was wearing a gray suit. Mrs. Lewis expressed surprise, saying "You aren't going home; aren't you going up to see the baby," to which Dr. Read replied, "I deliver them. I don't take care of them. I will call you a pediatrician." The names of Dr. Duffy and Dr. Prystowsky were mentioned, neither of whom was known to Mrs. Lewis, and she requested Dr. Read to get "the best man." Dr. Read returned to the desk. She was unable to contact Dr. Duffy but did have a telephone conversation with Dr. Prystowsky.
*162 Plaintiffs' theory of causation is predicated primarily upon a concatenation of alleged events, occurring in the delivery room, i.e., exposure, shock, anoxia, improper application of oxygen, and consequent brain damage.
There emerges from the foregoing background an intuitive inquiry respecting (a) temperature, (b) the administration of oxygen, and (c) the medical instructions before transferring the infant to the nursery.
(a) There is no proof as to the temperature of the delivery room between 4 P.M. and 5 P.M. on the day under consideration. The hospital engineer maintained a log book which disclosed a reading of 76° F. for the room at 8 A.M. He testified concerning a subsequent but unrecorded check two hours lated, described the automatically controlled heatingair cooling system, and acknowledged the existence of a master thermostat in the room which could be manually operated. Wogisch stated the room was air-conditioned, responding, "It didn't work so hot, I guess." While she testified "we are not permitted to wear sweaters in the labor and delivery room suite," nurse Blessing, when asked if she at any time in January 1956 wore a sweater in either the labor or delivery room, said "I don't remember." In Dr. Read's deposition, we observe the following:
"QUESTION: Was the temperature 72 or over in that delivery room on that day, in your judgment?
ANSWER: I don't recall.
QUESTION: Do you recall whether or not any of the nurses wore sweaters that day in the delivery room, or the labor room?
ANSWER: I do not recall.
QUESTION: Do you recall whether or not there was any conversation about the temperature in the delivery room or the labor room by the nurse or the intern or the anesthetist, or anyone else?
ANSWER: I do not recall."
Annis M. Ries, the head nurse, gave evidence that it was not customary at the hospital for nurses to take the temperature of newborns every four hours for the first three days of life unless a doctor ordered it. Dr. Read did not know the baby's temperature upon leaving the delivery room and *163 she did not give any instructions for it to be taken. Although there was testimony that only abnormal readings were charted, it is significant that the first notation of the baby's temperature that appears in the records of the hospital, admitted in evidence, is under date of January 28, 1956.
There was ample evidence elicited from the specialists testifying for the defense that temperature is one of the indicia of shock, and with newborns it should be taken on arrival at the nursery and thereafter at four-hour intervals for the first three days, and it should be recorded on the baby's chart.
(b) The procedure employed for the administration of oxygen is important because it is claimed that the child's brain damage resulted from anoxia (lack of oxygen in body cells and tissues). The bassinet was the open-type, so that oxygen transmitted from a tank to and through a funnel applied to a baby's face could readily be dissipated through the surrounding air. There was no accurate measurement of the flow of oxygen administered, only the doctor's estimate based on the air bubbles in an humidifier. Dr. Read, under cross-examination, gave these answers:
"Q. In other words, you determine the rate of oxygen intake into the child for forty-five minutes upon the rate of the bubbles? A. That's correct. * * *
Q. Isn't it a fact that this oxygen equipment had a dial on it that would indicate the amount of oxygen that you were giving the baby? A. On this tank I do not recall it. * * *
Q. I asked you whether or not there was a dial. By that I mean something with figures on it and a handle or anything? A. No, Sir."
Further, under recross:
"Q. How much time did you spend looking at this water through which the bubbles were running? A. I looked at it.
Q. What time? A. A couple of seconds." (Emphasis supplied)
Medical experts for the defense furnished adequate testimony that it was not the accepted standard practice to use an oxygen machine without a dial gauge on the equipment.
Dr. Read and nurse Wogisch admitted that an airlock incubator, equipped with a measuring gauge, was available in the *164 delivery room. It was not utilized. We note the testimony of Dr. Read under recross examination:
"Q. If the baby were in the air lock the amount of oxygen would be constant, would it not? A. Yes, sir. * * *
Q. So that had the baby been put in the air lock the concentration of oxygen for the baby would have been greater, would it not, assuming you had the same number of liters per minute? A. Yes, sir.
Q. Did you try it in the air lock? A. No, sir. * * *
Q. Madam, didn't you say it was better than an E&J, it can be used longer and the atmosphere therein is under pressure? A. That's correct."
The administration of unmeasured oxygen was allegedly constant during an estimated period of 45 minutes, the time between birth and when the baby was sent to the nursery.
Supplemental oxygen was not provided when the infant was transferred by Wogisch from the delivery room to the "upstairs" nursery, and this notwithstanding the fact that portable equipment to supply oxygen in transit was available in the hospital. In the judgment of Wogisch, however, it took less than a minute to make the translocation. Notwithstanding defendants' medical opinions that the transfer of the infant under the circumstances described was not a deviation from usual hospital routine and accepted medical standards, there was some qualifying testimony by defense witnesses, e.g., "if the baby was otherwise vigorous."
(c) On the question of medical instructions, when the baby was released to the nursery to await the "first opportunity" arrival of Dr. Prystowsky, we notice Dr. Read's testimony:
"Q. You said that you gave certain orders for the attention of the child once it got in the nursery. Is that correct? A. Yes, sir.
Q. To whom did you give those orders? A. To the nurse in charge of the nursery.
Q. Did you do that by phone or when you went upstairs? A. I instructed the nurse who took the baby up to tell the nurse in the nursery."
The cross-examination of nurse Wogisch, however, evinces an unexplained situation fraught with potential import. She stated:
*165 "Q. I see. Now, when you went upstairs, Mrs. Wogisch, did you put the baby in the incubator, check the flow of oxygen, and leave? A. Yes, sir. I did.
Q. Did you do anything else other than that in the nursery. A. No, sir. I did not.
Q. Then you did not transport any instructions, did you? A. No, sir." (Emphasis supplied)
There is no evidence in the record as to what instructions were given by Dr. Read to Wogisch, if in fact any were given, which had not been relayed to the nursery.
Part-time nurse Eleanor Granahan, who was in charge of the nursery on the evening of January 25, acknowledged (under cross-examination) writing in the nursery record of newborns "Admitted to S.W.N., baby cyanotic, possibly due to mucus." That she wrote down such a notation pursuant to the instructions of Dr. Read was admitted by the doctor.
Controlling facts, according to Dr. Read, were: the infant was born cyanotic and remained in that condition at all times while in the delivery room; after the umbilical cord had been severed, the baby was shown to her mother and forthwith taken to the instrument table (within the sterile field) "for 30 or 45 seconds" for the final application of an umbilical clamp and immediately thereafter she was placed in the heated bassinet where oxygen was applied; pure oxygen was used and three methods were employed  mask, pulmotor "for one or two breaths," and "I then put the oxygen on with the funnel." Nurse Wogisch and Dr. Islami corroborated her testimony in those particulars. The intern Dr. Bausch was not a witness. Apparently he was in Germany at the time of the trial and no pretrial deposition was taken of him.
Dr. Read denied any negligence in the professional care and treatment she rendered. The doctor was not asked and, accordingly, did not testify with respect to the conformity of her services with the standards and accepted practice in the field of her professional specialty. The hospital similarly denied negligence on its part.

*166 III.
The numerous witnesses testifying in the six-week trial included 16 doctors. Plaintiff's sole medical attestor was Dr. Emanuel M. Josephson. He examined baby Margaret on two occasions, September 22, 1959 and April 17, 1961, and was familiar with the records of her case at the St. Barnabas Hospital. He found the child's heart and lungs to be normal, but otherwise her physical and mental status was as heretofore indicated. She was "ament," afflicted with "cerebral degeneration secondary to anoxia," and was characterized as "just vegetable matter," with manifestations of damage to her brain and nervous system. In his opinion she suffered from exposure "dangerous in an infant," and her cyanotic condition in the delivery room was a sign of shock.
In response to hypothetical questions predicated upon plaintiffs' evidence in the record, his testimony was to the effect that the obstetrician in charge and the hospital deviated from accepted medical practice "in many respects," which he particularized; and within reasonable medical probability "there is a definite causal relationship" between the child's incapacitated condition and the treatment accorded to her immediately following birth; and that her critical condition at that time was neither fully recognized nor properly treated. After defining anoxia as "a failure of supply of oxygen to the tissues," he testified:
"The brain can tolerate anoxia for variable periods of time, depending upon the content of vitamins and other substances in the blood. It may only tolerate it for a matter of three or four minutes, or it may tolerate it for as long as ten or fifteen minutes, depending upon the state of nutrition of the individual suffering the anoxia. * * * with the onset of anoxia there begins degeneration of the brain."
The trial court admitted Dr. Josephson's testimony as an expert over objections voiced by counsel for the defendants. His qualifications were vigorously challenged, and his credibility *167 was attacked under incisive and extensive cross-examination. Concededly, he was not an obstetrician and, although he treated children within the scope of his personal practice, he disclaimed being a pediatrician. His educational background and experience, however, are not unimpressive. He had been a licensed physician in the State of New York since 1917, received his premedical schooling at Johns-Hopkins and a medical degree from the College of Physicians and Surgeons, Columbia University, pursued specialized courses of studies in France and Germany, and maintained an active membership with the American Association for Advancement of Science (a Fellow for the past 30 years), New York Academy of Science, International Congress of Opthalmology and International Congress of Otolaryngology. He was engaged in a private medical practice in New York City, "with special interests in diseases of the eye, ear, nose, throat and of the nervous system." Cross-examination disclosed that he had treated patients for neurological disorders and brain injuries.
At the time of the trial he voluntarily had no hospital affiliations, having discontinued such connections in the early '40s, but previously he had been associated with several metropolitan institutions including the Vanderbilt Clinic and the Post Graduate, Lenox Hill and Bellevue Hospitals. Except for his student days and a period of internship, he had delivered babies on only two or three emergency occasions. He testified, however, that he was generally acquainted with accepted practices in common usage incident to that area of the medical arts. By choice he was not a member of any local, state or national medical association. The witness was examined with exceptional prolixity respecting, inter alia, his scientific research and writings, claimed medical discoveries, disbelief in specialization, testimony as an expert in non-obstetrical cases, and, in particular, his critical attitude toward certain medical societies and foundations. The revealing results of such inquiries were elements for jury consideration as affecting the doctor's credibility rather than his competency to testify as a medical practitioner.
*168 Considering the doctor's experience, his general anatomical knowledge, and his examinations of the child, and in the light of the medical problems under review (which concerned the nervous system of an infant as well as a conventional child delivery), the trial court's determination that Dr. Josephson was qualified to testify as an expert was within the intendment of the guiding pronouncements in Carbone v. Warburton, 11 N.J. 418 (1953). The fact that he was licensed only in New York and his practice was other than obstetrics and pediatrics did not disqualify him from rendering an opinion concerning the acts or omissions charged to a specialist. Id., at page 426. See also Sanzari v. Rosenfeld, 34 N.J. 128 (1961). Ordinarily, a general medical practitioner is competent to speak with respect to the human anatomy. Note, Rogers on Expert Testimony (3d ed. 1941), §§ 156, 157, pp. 363-366.
On a motion for a "directed verdict," which was denied, the trial court was requested to re-evaluate the qualifications of the doctor, which brought forth a comment from the bench that "[t]he difficulty with these cases * * * is the well recognized reluctance of members of the medical profession to testify in malpractice case[s]." We do not agree with counsel's argument that such an observation evinced the court's erroneous adoption of the "conspiracy of silence" doctrine as the "primary standard for considering the competency of Josephson." Judicial cognizance that the medical profession is said to protect its members, and the consequent difficulties that plaintiffs sometimes experience in obtaining expert testimony, does not impute to the court a disregard for the established rules by which competency is tested.
In all, 11 medical experts testified for the defense. The non-examining specialists included four obstetricians-gynecologists and two pediatricians. Their testimony was directed primarily to standards of medical care. They were not interrogated on the issue of proximate cause.
*169 The examining physicians, neurosurgeons (2) and pediatricians (2), were not in accord as to their diagnoses. Variant conclusions were: mental deficiency, possibly on basis of anoxia at birth and "from history"; severe congenital encephalopathy with retarded physical and mental development; intracranial hemorrhage; and spastic infant, possibly caused by anoxia or congenital defect. Dr. Hackett, a treating physician, saw the baby seven times between February 19 and June 16, 1956, and expressed the opinion that "this was a brain damaged child from birth." He acknowledged, however, signing the hospital consultation report under date of January 30, 1956, signifying his impression "neonatal sepsis," and that no reference therein was made to a prenatal or congenital infirmity. The testimony of the foregoing experts which negated causal relationship was predicated upon hypothetical questions incorporating, in substance, Dr. Read's version of the facts.
At this point it is worthy of note that the court propounded an especially pertinent question to Dr. Read: "In the course of your administration to either the baby or Mrs. Lewis, did you in fact make any attempt to ascertain what was the cause of this [the baby's cyanotic condition]," to which the witness replied, "I did." The interrogation then continued:
"THE COURT: And did you arrive at a conclusion?
THE WITNESS: I arrived at no conclusion other than cyanosis. * * *
THE COURT: You did not make any further finding as to the cause?
THE WITNESS: Beyond what point?
THE COURT: I am not setting any point. Did you or did you not?
THE WITNESS: At any time?
THE COURT: Yes.
THE WITNESS: No, sir, I did not."

IV.
In the early English case of Lanphier and Wife v. Phipos, 8 Car. & P. 475, 479, 173 Eng. Rep. 581, 583 (C.P. 1838), decided about the time the College of Physicians of London was incorporated, Lord Chief Justice Tindal declared:
*170 "Every person who enters into a learned profession undertakes to bring to the exercise of it a reasonable degree of care and skill. He does not undertake, if he is an attorney, that at all events you shall gain your case, nor does a surgeon undertake that he will perform a cure; nor does he undertake to use the highest possible degree of skill. * * * The question is, whether this injury must be referred to the want of a proper degree of skill and care in the defendant or not."
It is an accepted legal precept in this State that a physician is not a guarantor of good results but he is required to have and to exercise in diagnosis and treatment the skill ordinarily exercised in his profession. "If, despite proper diagnosis and treatment no benefit resulted, no negligence could be charged, but if the treatment failed because of failure to exercise reasonable diligence, knowledge or skill, the result may be evidential of negligence." Young v. Stevens, 132 N.J.L. 124, 130 (E. & A. 1944). See also Clark v. Wichman, 72 N.J. Super. 486, 495 (App. Div. 1962). This court, in dealing with a malpractice tort action in Terhune v. Margaret Hague Maternity Hosp., 63 N.J. Super. 106 (App. Div. 1960), stated at page 111, that "the plaintiff ordinarily is required to establish that the defendant's treatment or care fell below the standard established and recognized by the medical profession for the indicated condition of the patient, and the standard must be proven by expert medical testimony," citing Toy v. Rickert, 53 N.J. Super. 27, 32 (App. Div. 1958). Situations where the asserted negligence consists of conduct so obviously wanting in reasonable skill and care that it may be so adjudged even by a layman are exceptions to this rule. Becker v. Eisenstodt, 60 N.J. Super. 240, 246 (App. Div. 1960), and see Parker v. Goldstein, 78 N.J. Super. 472 (App. Div. 1963), certification denied 40 N.J. 225 (1963); Curran, "A Symposium on Professional Negligence," 12 Vand. L. Rev. 535 (1959).
There are basic aspects of childbirth procedure within the common knowledge of the laity. Indeed, in Wilson v. Martin Memorial Hospital, 232 N.C. 362, 61 S.E.2d 102 (Sup. Ct. 1950), a case where the fetus did not survive and the *171 mother was permanently injured, it was held that the lack of ordinary care was patent and such as to be within the comprehension of laymen, only requiring common knowledge and experience to understand it and judge it, ergo expert testimony was not required. Note Annotation, "Malpractice in Childbirth Cases," 141 A.L.R. 111 (1942).
Additionally, it is settled beyond question that "one who holds himself out as a specialist must employ not merely the skill of a general practitioner, but also that special degree of skill normally possessed by the average physician who devotes special study and attention to the particular organ or disease or injury involved, having regard to the present state of scientific knowledge." Carbone v. Warburton, 22 N.J. Super. 5, 9 (App. Div. 1952), approvingly quoted by our Supreme Court in Carbone v. Warburton, supra (11 N.J., at page 426).
There was an overbalance of medical witnesses in favor of the defendants. While numerical superiority in qualified experts advancing competent testimony aids in establishing one's case, nevertheless the preponderance of the believable testimony as to the underlying facts is the criterion, not the quantum of witnesses produced at the trial. See Swanson v. Wiesenfeld, 24 N.J. Super. 576, 586 (App. Div. 1953); Gorczynski v. Public Service Interstate, etc., Co., 5 N.J. Super. 191, 194 (App. Div. 1949). The issue of credibility rested, as it inevitably does, with the trier of facts, and it was for the jurors to determine the weight to be accorded the testimony of witnesses. Ibid.
We have heretofore narrated facts which the jury could have found, as well as evidence which, although disputed, could have been believed.
The conflicting testimony with respect to the salient issues necessitated the resolution of doubts and disputes by the jury, a function that cannot be legitimately discharged by this court on a review of its verdict. Flexmir, Inc. v. Lindeman & Company, 8 N.J. 602, 605 (1952). It has been frequently said that a jury verdict is not to be set *172 aside against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice, or passion. R.R. 1:5-3(a); R.R. 2:5; Hager v. Weber, 7 N.J. 201, 210 (1951). To transcend the limited scope of our judicial review would infringe upon the constitutional right of trial by jury. Flexmir, supra (8 N.J., at page 605). Cf. Colacurcio Contracting Corp. v. Weiss, 20 N.J. 258, 262 (1955). Corroborative support for the facts postulated by Mrs. Lewis is perceptible not only from the opinion of Dr. Josephson but also from the records admitted in evidence and the testimony elicited from Dr. Read.
Prof. Nicholson J. Eastman, in his essay "Mount Everest in utero," has illustrated how the fetus adapts to an oxygen environment comparable to an adult human being at approximately an altitude of 33,000 feet, thus indicating the necessity for due care to avoid an insufficiency of oxygen following the transition from fetus to an independent human entity. 67 Am. J. Obst. & Gynec. 701 (1954). Furthermore, Van Liere points out in his work, Anoxia, Its Effect on the Body (1942), at page 208, "Of all the tissues in the body, nervous tissue is the least capable of withstanding oxygen want."
The knowledge and understanding of such fundaments of childbirth are chargeable to Dr. Read, a specialist in obstetrics and gynecology. Her undenied and unexplained displaying of baby Margaret to the mother a few minutes after birth with the comment "that she had a nice, vigorous, healthy baby," coupled with an untoward event called for the exercise of a special degree of skill and effort demanding an avoidance of any unnecessary exposure, a recognition of the child's critical cyanotic condition, the administration of oxygen therapy by the best means available, a prompt diagnosis, adequate instructions, proper recordation of essential data, and an awareness of the immediacy and medical treatment that the circumstances demanded. There is embraced within the trial record ample evidence upon which the jury could have justly *173 premised a verdict in favor of the plaintiffs. The case was not lacking in proof as to negligence or causation.

V.
On the basic issue of liability, the trial court's charge to the jury was clear and explicit; it was fair, comprehensive and legally sound. Not so, however, as to the question of damages, concerning which no requests were submitted to the court  that phase of the jury charge was de minimus. In effect, the jury was left without guide or compass in its determination of reasonable compensatory damages; this absence was compounded by the inconclusiveness and the inadequacy of the proofs relating to that subject.
The evidence as to special damages extended no farther than brief testimony as to certain doctor bills amounting to a few hundred dollars and the production in evidence of an order of the Union County Court admitting the infant plaintiff to Runnells Hospital. The substantive terms of that adjudication required the payment of $50 per month for the child's support until further order of the court, subject, however, to a continuing liability "to pay the full per capita cost of maintenance of said patient" upon establishing that any person chargeable with legal liability has the ability to pay.
There were no proofs adduced as to the anticipated expenses of maintaining baby Margaret at Runnells Hospital, or in any institution, other than the limited provisions of the aforesaid court order. We note that plaintiffs' counsel, in his opening statement to the jury, stated that the infant "will remain in some institution for the rest of her life." Support for that statement is implicit in the evidence.
The verdict for baby Margaret was predicated upon pain and suffering. Pain being a subjective phenomenon, only the person who experiences it is qualified to testify as to its reality. Neither the doctor nor the child's mother was competent to prove that the child consciously endured pain. It was within the province of the jury, nonetheless, to make such a determination *174 from the testimony and evidence before it relative to the child's injuries and her physical actions, reactions and responses. There was evidence that the child's central nervous system, including the brain, was impaired and that all five senses had been affected. The unusual circumstances of the pending litigation called for pertinent instructions.
When "pain and suffering" are equated with legal damages, the applicable rule is "fair and reasonable compensation." Botta v. Brunner, 26 N.J. 82, 92 (1958). The law does not countenance a limitless recovery without any guides for measurement except sympathy and uncontrolled discretion. In making an assessment, the jury should have the benefit of instructions pointing out what limits are to be observed. See Gabriel v. Auf Der Heide-Aragona, Inc., 14 N.J. Super. 558 (App. Div. 1951), and generally 41 Am. Jur., Physicians and Surgeons, § 133, pp. 247-248; 25 C.J.S. Damages § 178, pp. 866-867; 6 Belli, Modern Trials, Damages, "Pain and Suffering," § 288, p. 422 et seq. (1963); McCormick on Damages, "Instructions upon the Measure and Assessment of Damages," § 15, pp. 58-61 (1935). The law abhors damages based upon mere speculation. It is the responsibility of the trial judge to make it clear to the jury that, in assessing damages for pain and suffering, the award must be limited to compensation and compensation alone. Moreover, conscious suffering is the only proper basis for pain and suffering. Oleck, Damages to Persons and Property (rev. ed. 1961), c. XV, "Pain and Suffering," § 176, pp. 247-249. See also 2 Harper and James, The Law of Torts, "Pain, suffering, mental distress," § 25.10, p. 1312 (1956).
While the trial judge in his charge made reference to the testimony of Dr. Josephson that the life expectancy of baby Margaret depended upon nursing care, and with proper nursing "the child had a normal life expectancy," there was no evidence as to what that expectancy might be in terms of probable years. The court made no mention of Dr. Howard E. Medinets' testimony:
*175 "My opinion is that the life expectancy of this child is severely limited. Between my two examinations, a period of almost three years, the head had grown only one inch. The body weight had increased only to twenty-six and a half pounds which is the body weight of a child less than two, so that although the child is receiving excellent care at the Runnells home, the child just is not developing. * * * This child is in the category of idiot. * * * The maximum mental age is less than three. * * * Life expectancy is very limited."
Considering the nature of the conceded abnormalities, physical and mental, of the infant and the fact that she has never known and presumably will never know normality, precautionary instructions should have been given to the jury respecting the probable duration of her life.
The meager proofs directed to the issue of damages and the paucity of the guiding instructions of the court to the jury on that subject engendered in the case an element of speculation as to damages which is not consonant with basic justice. In effect, the jurors were left to abide by their own conscience, apply the Golden Rule (see Botta v. Brunner, supra, 26 N.J., at page 94), and to fix the amount of compensation awards without benefit of appropriate guidelines. That issue should be tried de novo.
We may, in our sound discretion, limit a new trial to the question with respect to which the verdict is found to be wrong. When the issue of liability has been clearly and properly decided against a defendant, and the error relates only to the quantum of recovery, the re-litigation may be limited to the question of damages. Coll v. Sherry, 29 N.J. 166, 177 (1959). But see Kress v. City of Newark, 8 N.J. 562, 576 (1952). Such power, however, "should be exercised sparingly and with great caution, and only when it is clear that the issues of liability and damage are readily separable." Rommell v. U.S. Steel Corp., 66 N.J. Super. 30, 48 (App. Div. 1961), certification denied 34 N.J. 580 (1961). Accord, Dahle v. Goodheer, 38 N.J. Super. 210 (App. Div. 1955), certification denied 20 N.J. 534 (1956). Compare Kopec v. Kakowski, 34 N.J. 243 (1961).
*176 The fact that the jury erred as to damages may support an inference that error was also committed on the issue of liability. The inference, however, is overcome where "the issue of liability was clearly and properly decided against the defendant." Coll v. Sherry, supra (29 N.J., at page 177).
The jurors deliberated for six hours, at one point they requested further instructions, and ultimately they exculpated Dr. Prystowsky, a codefendant. That the amounts of the verdict appear to be excessive and a resultant mistake chargeable to the inadequacy of instructions does not taint all of the issues in the cause.
The several alleged trial irregularities briefed and argued on this appeal have been considered. They do not, in a singular or plural sense, when brought into focus with the total record, constitute reversible error.
We conclude from our review of the record that the separable issue of liability was clearly, properly and unmistakably decided against the defendants Dr. Read and the hospital. The evidence indicates that the jury acted within the periphery of its responsibility and reached a fair and reasonable conclusion. A just purpose would not be served by submitting the issue of liability for redetermination.
Reversed and remanded for a new trial as to damages only. No costs.