247 N.J. Super. 435 (1991)
589 A.2d 653
MARY B. EYOMA, H. SCOTT HART, ADMINISTRATOR OF THE ESTATE OF FRANCIS S. COKER AND ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF FRANCIS S. COKER, PLAINTIFFS-RESPONDENTS, CROSS-APPELLANTS,
v.
LINDA FALCO, R.N., DEFENDANT-APPELLANT, CROSS-RESPONDENT, AND WILLIAM BROTHERTON, M.D., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 6, 1991.
Decided April 25, 1991.
*437 Before Judges SHEBELL, HAVEY and SKILLMAN.
Rowena M. Duran argued the cause for appellant (Hurley & Vasios, attorneys; Daniel M. Hurley, of counsel; Rowena M. Duran, on the brief).
*438 Barry D. Epstein argued the cause for respondents cross-appellants Eyoma and Hart (Barry D. Epstein, P.A., attorneys; Elizabeth Holmes, on the brief).
Craig S. Combs argued the cause for respondent Brotherton (Giblin & Combs, attorneys; Craig S. Combs, on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
In this case, among other issues, we are called upon to determine the elements of damages that may be awarded to the estate of a tortiously-injured party who, before death, existed in a comatose condition, unable to perceive pain or pleasure. This appeal arises out of the death of Francis S. Coker (decedent) who was admitted to Hackensack Medical Center on January 9, 1986 for removal of his gall bladder. The anesthesiologist assigned to him was defendant-respondent, Dr. William Brotherton; his recovery room nurse was defendant-appellant, Linda Falco, R.N. On the day of surgery, Dr. Brotherton brought decedent into the operating room at 11:30 a.m. Dr. Brotherton had previously participated in at least 150 gall bladder removal operations. After what Dr. Brotherton described as "a relatively short, simple procedure," the patient was transported to the recovery room at approximately 12:35 p.m.
Enroute to the recovery room, decedent attempted to lift his head and hands, to sit up, and to remove the airway tube that had been placed in his mouth. In the recovery room, decedent was initially breathing at a rate of twelve respirations per minute, and his blood pressure was stable; Nurse Falco, however, stated that decedent's respirations were shallow. Decedent responded to movement requests and was able to pull the oral airway from his mouth.
According to Dr. Brotherton, he finished removing decedent's airway tube and orally instructed a recovery room nurse, whose identity he could not recollect, "the patient got narcotics, please watch his respirations." In addition, Dr. Brotherton gave written *439 instructions "Post-op orders: Nasal cannula, three liters, .002 per minute in P.A.R. Discharge from P.A.R. when stable." Dr. Brotherton testified that based upon his observations, there was no need to administer any drug to reverse the anesthesia, though no monitoring tests to evaluate decedent's neuromuscular status were recorded by Dr. Brotherton. Apparently, after only a few minutes, Dr. Brotherton left the recovery room, but thereafter returned to check on the decedent.
Nurse Falco testified that after Dr. Brotherton left the recovery room she asked another nurse to watch the decedent. She then left the recovery room to care for another patient. Nurse Falco admitted she never got a verbal response from the other nurse, and that when she returned there was no one near decedent. She acknowledged that Dr. Brotherton told her to watch the decedent's breathing, but claimed she was not told that decedent had been given narcotics. She maintained that upon her return she checked the decedent and observed his respirations to be eight per minute.
Thereafter, Dr. Brotherton returned and inquired about the decedent's condition. Nurse Falco informed the doctor that the patient was fine. However, upon his personal observation, Dr. Brotherton realized that decedent had stopped breathing. Dr. Brotherton immediately attempted to resuscitate decedent; however, the patient's heart rate began to drop, and he went into cardiac arrest. Twenty minutes elapsed before decedent resumed breathing.
Decedent, because of oxygen deprivation, entered a comatose state and remained unconscious for over a year until his death on January 20, 1987. Decedent apparently suffered respiratory arrest before experiencing cardiac arrest. The respiratory arrest was due to respiratory depression resulting from the influence of anesthesia and a narcotic drug. During surgery, decedent was given Sufentanil, a narcotic drug with the capacity to enter the portion of the brain controlling respiration and *440 thereby shut down the respiratory system. Dr. Brotherton was aware of reports that Sufentanil can cause a patient to appear conscious and then later undergo a delayed reaction which terminates breathing.
Plaintiffs' medical expert testified that Dr. Brotherton deviated from the proper standard of care because he "should have stayed in the recovery room and checked on the patient for about at least ten minutes and then should have stayed longer if he wasn't satisfied the patient was doing well." According to this expert, with whom appellant Falco's expert concurred, the narcotic administered was "the most potent narcotic we have available to us today." Plaintiffs' expert explained that Dr. Brotherton should have taken greater care to monitor decedent once the breathing tube was removed because there was less stimulation of the patient without the tube. He also cited Dr. Brotherton's failure to communicate to Nurse Falco the specific drug given to the decedent, and the doctor's failure to take adequate measures to verify that he had sufficiently reversed the effects of a muscle relaxant given earlier, as departures from proper practice.
Nurse Falco's expert agreed that Dr. Brotherton deviated from accepted standards and stated:
I think Dr. Brotherton should have been aware that his patient might become renarcotized from that dose of Sufenta[nil] after the removal of the endotracheal tube should have stayed with this patient until he was absolutely sure that it was safe to do so and I believe he should have given some amount of Narcan to further ensure that the respiratory depressant effects of this dose were counteracted.
Falco's expert believed that Dr. Brotherton improperly delegated the duty to monitor the patient to recovery room personnel.
Two doctors testified on Dr. Brotherton's behalf. They asserted that it was the job of the recovery room nurse to monitor the patient and that the doctor had not deviated from medical standards in leaving the recovery room under the circumstances, nor had he deviated from any other requisite standards. Both experts concluded that the cause of the respiratory arrest was improper monitoring by the recovery room nurse *441 after Dr. Brotherton left the patient in her care. Plaintiffs' expert also testified that Nurse Falco deviated from requisite standards governing the conduct of a recovery room nurse by failing to ascertain the drugs administered to the decedent, leaving the patient without verifying that the patient would be monitored, and failing to recognize that the patient had stopped breathing.
The testimony of decedent's mother, Mary B. Eyoma, and the decedent's fiancee Gloria Harris, established the facts relevant to the issue of damages. Decedent was born on May 13, 1959, received a high school certificate in Nigeria, had a daughter by a woman in Nigeria, and in 1981 came to the United States. The daughter, born in September of 1981, was given the name Mary-Ann Coker, although the child's parents never married. The child lived with the decedent's mother in England and, according to the mother, the decedent sent money and gifts and remained in communication through several telephone calls a week. He last visited his daughter and mother in England three months before entering the hospital. His mother described a close, loving relationship between the decedent, herself, and Mary-Ann and referred to her son as her "backbone." She testified that the decedent sent money or things of value worth $600 per month in 1985: $400 to her, $200 to Mary-Ann. When decedent first slipped into a coma, his mother was with him every day for many weeks. She later visited every three months. When she was not visiting, she sent other family members.
Shortly after arriving in the United States in 1981, the decedent married. He was divorced in July 1985. A child of that marriage, Victoria, was born on March 24, 1984. Victoria lives with her mother in Brooklyn, New York. In 1985, decedent became engaged to marry Gloria Harris, and had planned to bring his daughter Mary-Ann to the United States to live with them after their marriage in August 1986. His fiancee testified that decedent had a "very good relationship" with Victoria. He visited her often to take her shopping and on *442 various outings. On February 20, 1985, the decedent was ordered to pay sixty-five dollars twice a month for Victoria's support.
According to his fiancee, decedent "was in great health, he  we went to dances on the weekends, movies, he played tennis on Sundays when he could. He was in great health." He had many friends and enjoyed spending time with them when possible. He attended Ramapo College and then transferred to Passaic Community College, studying banking and finance. Decedent was a nurse's aid in various hospitals and was in the National Guard. He also worked as a part-time security guard for part of 1985. Decedent's income tax returns were admitted in evidence. His W-2 forms indicated that his earnings for 1985 amounted to $14,547.26, with $988.98 federal income tax withheld, $395.69 state tax withheld, and $1,025.50 social security tax withheld. His expenses appeared to have exceeded his reported income.
The trial judge charged the jury that, in addition to medical and funeral expenses, it could award survival damages to decedent's estate for decedent's loss of enjoyment of life during the time he was in a coma. Specifically, the court, in reviewing interrogatories, stated:
Now, the estate, and that's where that other blank is, when we talk about the deprivation of the enjoyment of the life of Francis Coker from the time that this arrest, pulmonary arrest, cardiac arrest came into being for that period in his lifetime when he was in the hospital in an unconscious state and you've heard the testimony of  or from the mother who testified and the girl that he was engaged to testified and they told you what Francis did prior to his being hospitalized, his routine, what he enjoyed doing, what they did together, and you are to come up with a sum that is reasonable for this deprivation of enjoyment of life. [Emphasis added].
During the course of deliberations, the jury asked for further explanation of loss of enjoyment of life. The judge explained:
Now you'll recall when I spoke of it I said you can learn and recognize what Francis Coker enjoyed during life. That was testified to by Gloria Harris and by his mother. Now, the estate is entitled to those damages. Had he not been in a comatose state but not been able to enjoy life and he was a plaintiff whose damages would be awarded to him.

*443 ....
THE FOREMAN: The other question is how much would it have been worth to him, if you can phrase that, not to be around for a year, the things that he did.
Is that this question?
THE COURT: You have that one year and that's what you're confining yourself to, what enjoyment he is not able to have during that period of time and 
With respect to the wrongful death claim, the trial judge permitted the jury to apportion the award for wrongful death damages by using a verdict form that contained separate awards for the mother and two children rather than a lump sum for the estate. The impropriety of this procedure was raised in plaintiffs' motion for a new trial; however, the judge refused to grant a new trial on that basis.
The jury, having been instructed to find either or both defendants liable, found Nurse Falco 100% liable, thereby exonerating Dr. Brotherton. The jury awarded the estate $140,853.98 on the survival action including the stipulated $121,065.98 for medical expenses and $2,288 for funeral expenses. The jury thus awarded $17,500 for "Francis Coker's loss of enjoyment of life from January 9, 1986 to January 20, 1987." On the wrongful death action, the jury awarded $25,000 to each of Coker's two daughters. No damages were awarded to his mother.
Plaintiffs moved for a new trial, a judgment notwithstanding the verdict, or an additur. Appellant, Falco, filed a cross-motion seeking "an order compelling a New Trial on all issues and as to all parties in the event the Court somehow grants plaintiff's application for a New Trial." By letter opinion the trial judge granted plaintiffs' motion for additur, granting an additional $132,500 for loss of enjoyment of life.
Appellant, Falco, filed this appeal seeking to vacate the entire award for loss of enjoyment of life, or, alternatively, seeking to reinstate the original jury verdict. Plaintiffs cross-appeal for a new trial as to both defendants on both damages and liability, or, alternatively, damages alone. Thus, only defendant Brotherton *444 fails to take exception to the judgment as it now stands. Appellant Falco argues that damages for loss of enjoyment of life are not allowable when the injured party is comatose, but that even if we were to recognize the right to hedonic damages as a compensable form of non-pecuniary damage, we should vacate the additur, which increases the loss of enjoyment of life award from $17,500 to $150,000, and reinstate the jury's original award.

I.
We first consider plaintiffs' assertion that a new trial should have been granted as to the liability of both defendants. A trial judge, pursuant to R. 4:49-1, must grant a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1. To decide if a miscarriage of justice has occurred, we give deference to the trial court with respect to factors that are not apparent in the record on appeal such as the credibility and demeanor of witnesses. Beyond those considerations, a reviewing court may independently scrutinize the record in order to determine whether the result was just. See Carrino v. Novotny, 78 N.J. 355, 360-61, 396 A.2d 561 (1979); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98, 379 A.2d 225 (1977); R. 2:10-1.
In seeking a new trial as to liability, plaintiffs point to the "shockingly low" damage award, asserting that "[a]lthough a shockingly low damage verdict does not necessarily signify a fault in plaintiff's liability verdict, it may imply defects in the work of the court or jury. The liability verdict may survive only if it is separable and otherwise sound...." Tronolone v. Palmer, 224 N.J. Super. 92, 98, 539 A.2d 1224 (App.Div. 1988) (citations omitted).
Our careful examination of the trial record convinces us that the liability verdict is separable from the damage award and is *445 otherwise sound. There was sufficient credible evidence to support the jury's finding that Nurse Falco was 100% negligent. She was clearly assigned the responsibility to monitor the decedent in the recovery room; yet by her own admission, she delegated that duty to another nurse without verifying that the other nurse accepted that responsibility. When she resumed monitoring of the decedent Nurse Falco did not detect that he had stopped breathing and, therefore, did not get him the necessary medical attention at that critical time.
The record no doubt could also support a finding of liability against Dr. Brotherton. There was testimony that Dr. Brotherton deviated from proper medical practice in that he did not advise Nurse Falco of the type of narcotic decedent was administered and did not remain to observe the patient for a sufficient time before he left the recovery room, particularly in light of the potent drug which the decedent was given. Nevertheless, in the face of clear expert testimony to the contrary stating that Dr. Brotherton conformed with the standards governing anesthesiologists, the mere ability of the evidence to support a different result does not authorize us to disturb the jury finding of no liability. Plaintiffs also assert that the verdict was tainted due to the racial composition and the bias of the jury. There is no evidence in the record, however, that suggests the existence of prejudice. We therefore affirm the liability portion of the jury verdict.

II.
Appellant Falco claims that the trial judge erroneously permitted recovery for hedonic damages  loss of enjoyment of life, as the victim was unconscious and unable to appreciate his incapacitation and loss in the year during which he existed in a comatose state. We are satisfied that loss of enjoyment of life is a separate and distinct item of damages, recoverable in a survival action, and the fact that the victim may be in a comatose state should not preclude an award of damages for *446 the total disability and impairment inflicted by the tortious injury.
N.J.S.A. 2A:15-3 which governs survival actions provides:
Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living.

In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased. [Emphasis added].
Generally, all jurisdictions recognize at least the following three categories of damages: (1) loss of earning capacity; (2) out-of-pocket expenses; and (3) pain and suffering. Gregory v. Carey, 246 Kan. 504, 511-14, 791 P.2d 1329, 1335-36 (1990); see Comment, Loss of Enjoyment of Life as a Separate Element of Damages, 12 Pac.L.J. 965, 966 (1981). However, the issue of damages for loss of enjoyment of life has generated divergence of opinion among legal scholars. The treatment of hedonic damages by various jurisdictions has been accurately summarized as follows:
There exists, however, a fourth category which is recognized in approximately half the states  loss of enjoyment of life. Loss of enjoyment of life damages are those damages which flow from physical impairments which limit plaintiff's capacity to share in the amenities of life. Currently, three different views prevail among those jurisdictions that have addressed the issue of whether loss of enjoyment of life is a recognizable category of injury for which damages may be awarded. A minority of jurisdictions refuse any recovery for loss of enjoyment of life. Most of these jurisdictions, however, base their positions on decisions rendered at the turn of the century that largely have been ignored. The majority position allows consideration of loss of enjoyment of life, but only as one of the numerous factors characterizing a general damage award for pain and suffering. Finally, proponents of a third position assert that loss of enjoyment of life is a proper element of damages, separate and distinct from pain and suffering, for which compensation should be awarded. The current debate surrounding loss of enjoyment of life centers around whether it should be treated as an integrated element of pain and suffering or as an independent element of damages. [Id. at 966-67 (footnotes omitted) (emphasis in original)].
Among the conflicting authority from other jurisdictions lies support for plaintiffs' position that consciousness is not a *447 prerequisite for recovery for loss of enjoyment of life. For example, the Supreme Court of West Virginia, in Flannery v. United States, 297 S.E.2d 433 (W. Va. 1982), took the view that "consciousness" of the loss is immaterial to recovery for hedonic damage. There, the court specifically questioned whether, under state damage law, "a plaintiff in a personal injury action who has been rendered permanently semi-comatose is entitled to recover for the impairment of his capacity to enjoy life." Id. at 434. In assessing how to categorize hedonic losses, the court refused to place them within the rubric of pain and suffering "since one can lose his eyesight or a limb and be without physical pain. Yet, it is obvious that such injuries will impair the person's capacity to enjoy life." Id. at 437. Consequently, it placed loss of enjoyment of life within the compensable category of permanent injury "which includes `those future effects of an injury which have reduced the capability of an individual to function as a whole man'." Id. (citation omitted).
The court further held that "the plaintiff's lack of knowledge of the extent of his permanent injury is not a factor under [that] `whole man' test." Id. at 438. In support of that holding the court analogized the situation of the unconscious plaintiff with that of an injured infant who, due to minimal experience, cannot appreciate the disability. Id. In the infant situation, recovery is permitted despite the limited consciousness of the injury. Id. Thus, the court refused to recognize subjective knowledge as a controlling factor in assessing compensation for loss of enjoyment of life. Id.; see also Comment, Nonpecuniary Damages for Comatose Tort Victims, 61 Geo.L.J. 1547 (1973); but see Flannery v. United States, 718 F.2d 108 (4th Cir.1983) (holding that the award for loss of enjoyment of life in Flannery was punitive in nature and thus, impermissible under the Federal Tort Claims Act).
Other courts, though refusing to recognize loss of enjoyment of life as a separate element of damages, nevertheless permit recovery for such damages within the categories of pain and suffering and disability. See Gregory v. Carey, 246 Kan. at *448 504, 791 P.2d at 1329; Leiker v. Gafford, 245 Kan. 325, 778 P.2d 823 (1989). Gregory v. Carey, 246 Kan. at 504, 791 P.2d at 1329, involved a victim of negligence who existed in a "persistent vegetative state." Id. 791 P.2d at 1331. The lower court allowed closing argument on loss of enjoyment of life as a compensable form of damages. Id. The defendant argued that adherence to such a rule was improper claiming that "if one cannot suffer mental anguish, he likewise cannot suffer loss of enjoyment of life." Id. at 1334. Without expressly indicating whether or not some level of consciousness is necessary to recover, the Kansas Supreme Court, after reviewing the various approaches to categorizing damages for loss of enjoyment of life "took the more realistic approach that, as a general rule, the loss of enjoyment of the pleasurable things in life is inextricably included within the more traditional areas of damages for disability and pain and suffering." Id. at 1336. The court did so recognizing that allowing the loss of enjoyment of life to exist as a separate form of damages would result in duplicative awards. Id. Compare with Dunn v. Cadiente, 503 N.E.2d 915, 919 (Ind. Ct. App. 1987) (Individual "is entitled to the full function of his body, and any loss or disability thereof is in itself compensable because of its effect upon the quality and enjoyment of life which would not have been impaired but for his injury.") and McNeill v. United States, 519 F. Supp. 283, 289 (D.S.C. 1981) (deprivation of the opportunity to enjoy life included within recovery for permanent bodily impairment or disability).
These authorities suggest that consciousness is immaterial in awarding damages for the loss of enjoyment of life because the impairment exists independent of the injured party's ability to comprehend it. Counterbalancing the authority which favors recovery of hedonic damages regardless of the victim's mental state, there are out-of-state cases to support the position that such damages are within the purview of pain and suffering and, thus, noncompensable in the absence of conscious appreciation of the damage. See, e.g., Poyzer v. McGraw, 360 N.W.2d 748 *449 (Iowa 1985); McDougald v. Garber, 73 N.Y.2d 246, 538 N.Y.S.2d 937, 536 N.E.2d 372 (1989). Perhaps the strongest support for this position is presented in the opinion of the New York Court of Appeals in McDougald v. Garber, 73 N.Y.2d at 246, 538 N.Y.S.2d at 937, 536 N.E.2d at 372; but see Comment, Damages  Loss of Enjoyment of Life  New York Court of Appeals Denies Loss-of-Enjoyment Damages to Comatose Plaintiffs  McDougald v. Garber, 73 N.Y.2d 246, 538 N.Y.S.2d 937, 536 N.E.2d 372 (1989), 103 Harv.L.Rev. 806, 817 (1990) (criticizing McDougald stating, "A recognition of the need for the incentive effects of malpractice damages suggests that courts should allow loss-of-enjoyment awards to comatose plaintiffs"). In McDougald, the plaintiff was left in a permanent comatose condition as a result of malpractice committed during surgery. The issues before the court were "(1) whether some degree of cognitive awareness is a prerequisite to recovery for loss of enjoyment of life and (2) whether a jury should be instructed to consider and award damages for loss of enjoyment of life separately from damages for pain and suffering." Id. at 251, 538 N.Y.S.2d at 938, 536 N.E.2d at 373. The court first emphasized that the fundamental purpose of a damage award in tort law is to "compensate the victim, not punish the wrongdoer" and noted that although compensatory damages sometimes have a deterrent effect, purely punitive awards are prohibited. Id. at 253, 538 N.Y.S.2d at 939, 536 N.E.2d at 374.
Finding that recovery for loss of enjoyment of life would not result in "meaningful compensation" for a comatose tort victim, the court accordingly concluded "that cognitive awareness is a prerequisite to recovery for loss of enjoyment of life." Id. at 255, 538 N.Y.S.2d at 940, 536 N.E.2d at 375. After considering whether to treat loss of enjoyment of life as a separate category of damages, it held that a separate damage category is not appropriate as "suffering need not be so limited  it can easily encompass the frustration and anguish caused by the inability to participate in activities that once brought pleasure." Id. at 257, 538 N.Y.S.2d at 941, 536 N.E.2d at 376. According to the *450 court, creating a separate category would only result in distorted awards as "the estimation of nonpecuniary damages is not amenable to such analytical precision and may, in fact, suffer from its application." Id.; see also Andrulonis v. United States, 724 F. Supp. 1421, 1525 (N.D.N.Y. 1989); Poyzer v. McGraw, 360 N.W.2d at 753 (recognizing "loss of enjoyment of life as a factor to be considered as part of future pain and suffering"); Blodgett v. Olympic Sav. and Loan Ass'n., 32 Wash. App. 116, 646 P.2d 139, 145-46 (Ct.App. 1982) (damages for the loss of life's pleasures and amenities are "but a component of pain, suffering, anxiety, and distress").
Existing New Jersey law is not particularly helpful on the issue of hedonic damages. In Theobold v. Angelos, 40 N.J. 295, 191 A.2d 465 (1963), our Supreme Court enumerated the elements to be considered when assessing a damage award for personal injuries. Id. at 304, 191 A.2d 465. The Court found that an appropriate sum would incorporate compensation for
bodily injuries, for the pain and suffering resulting therefrom, past, present and future, for the effect of those injuries upon his health according to their degree and probable duration, and for any permanent disability which in reasonable probability has resulted or will result. To that sum should be added all expense, past and future, reasonably necessary or incidental to plaintiff's efforts to cure or alleviate his injuries or resulting disability, and all other pecuniary losses suffered or to be suffered in the future as the result of his inability to engage in his usual occupation. [Id.].
See also New Jersey Model Jury Instructions § 6.10 (3d. ed. 1990) (distinguishing damages for disability and impairment from damages for pain and suffering).
In personal injury actions, damages, both pecuniary and nonpecuniary in nature, are compensable. Damages for the loss of enjoyment of life appear to come within the category of non-pecuniary damages. New Jersey authority has recognized that a plaintiff must be conscious of the loss in order to recover compensation for certain types of non-pecuniary damages. See Lanzet v. Greenberg, 222 N.J. Super. 540, 542, 537 A.2d 742 (App.Div. 1988) (citing Lewis v. Read, 80 N.J. Super. 148, 174, 193 A.2d 255 (App.Div.), certif. granted, 41 N.J. 121, 195 A.2d *451 17 (1963)); Paladino v. Campos, 145 N.J. Super. 555, 368 A.2d 429 (Law Div. 1976). Our holding in Lewis v. Read, 80 N.J. Super. at 148, 193 A.2d 255, stressed that damages for pain and suffering must be "limited to compensation and compensation alone," and therefore "conscious suffering is the only proper basis for pain and suffering." Id. at 174, 193 A.2d 255; see Lanzet, 222 N.J. Super. at 543, 537 A.2d 742. Accordingly, we recognized that "conscious suffering is the only proper basis for pain and suffering." Lewis v. Read, 80 N.J. Super. at 174, 193 A.2d 255. Thus, it is logical that if a plaintiff is in a comatose state, he or she is unaware of any loss of enjoyment of life and cannot recover for the anguish caused from knowing of that loss.
In Lanzet, the plaintiff's decedent suffered irreversible brain damage and eventually died as a result of medical negligence. 222 N.J. Super. at 542, 537 A.2d 742. The jury awarded no damages for pain and suffering yet awarded the stipulated amount for medical expenses. The trial judge granted a new trial with respect to plaintiff's claim for compensation for disability and impairment, recognizing a deficiency in the charge on that aspect of damages. We affirmed recognizing a distinction between recovery for pain and suffering and recovery for disability and impairment. Id. at 543, 537 A.2d 742.
Rejecting the contention that disability and impairment is not compensable unless consciously experienced, we stated:
In our view, such an award does not depend on the individual's capacity to perceive and appreciate the curtailment of her active life. That form of anguish is redressible as pain and suffering. Damages for disability and impairment compensate for interruption of function which diminishes the individual's capacity for physical and mental activity. Reale v. Tp. of Wayne, 132 N.J. Super. 100, 114 [332 A.2d 236] (Law Div. 1975). See also Simmel v. N.J. Coop. Co., 28 N.J. 1, 16 [143 A.2d 521] (1958). [Id. (emphasis added)].
We distinguished the Law Division's holding in Paladino v. Campos, stating:
Defendants' reliance upon Paladino v. Campos, 145 N.J. Super. 555 [368 A.2d 429] (Law Div. 1976), is misplaced. Although the Law Division there spoke broadly of "the rule that compensation for nonpecuniary losses must be based on an awareness by the injured person of the loss," the context in which it *452 wrote and the cases which it cited as precedent leave no doubt that the court was addressing claims for pain and suffering, not disability and impairment. Id. at 558 [368 A.2d 429]. [Lanzet, 222 N.J. Super. at 543-44, 537 A.2d 742].
Disability and impairment is clearly distinct and separate from pain and suffering and, unlike pain and suffering, evaluation of disability and impairment does not require one to focus upon the victim's "consciousness" of the disability. It encompasses compensation for the inability to pursue one's normal activities and compensates for the status of being limited or incapacitated. We believe that the loss of pleasure and enjoyment, which as a natural and direct consequence accompanies that incapacity, is a loss that is inseparable from it and is not dependent on the ability to appreciate one's own restrictions. Thus, a plaintiff who has been comatose should, as part of disability and impairment, be compensated for the loss caused by existing in a comatose state including the resultant loss of enjoyment of normal activities.
It would be fallacious to sever loss of enjoyment of life from disability and impairment by equating it with the anxiety suffered as a result of being aware of that loss. As stated, anxiety is compensable only if it is consciously suffered. However, the actual loss of enjoyment of life is not a function of pain and suffering. See Flannery, 297 S.E.2d at 437. Rather, it is an element of the permanent injury plaintiff has suffered. As the Supreme Court of West Virginia in Flannery notes:
the degree of a permanent injury is measured by ascertaining how the injury has deprived the plaintiff of his customary activities as a whole person. The loss of customary activities constitutes the loss of enjoyment of life. [Id. at 436 (emphasis added)].
New Jersey has long recognized disability and impairment as a separate category of damages. This element of damages must provide just and adequate compensation for the interruption of mental and physical functions. Damages awarded for items of direct or out-of-pocket pecuniary loss, such as deprivation of earnings, the cost of medical care and personal maintenance, or even the loss of services and comfort by those entitled to bring per quod claims, cannot fully or adequately compensate *453 for the total disability inflicted on the injured tort victim who is rendered comatose. There is an inability to carry on activities and pursuits that must be recognized as causing loss or damage. Surely part of what is lost is the real personal joy and pleasure that the comatose victim might otherwise have experienced. The victim's inability to be presently aware of the loss may prevent further pain and suffering over those inabilities; however, it does not diminish the loss of enjoyment that the human being otherwise would have experienced. This is not a concept that is too esoteric for a jury to understand and evaluate. We are not persuaded that any award will be overly speculative or improperly punitive.
In summary, we hold that damages for loss of enjoyment of life may be awarded as part of damages for the total disability and impairment which exists when tortious injury causes one to be in a comatose or vegative state.

III.
Although the trial judge informed the jury that it could award damages for loss of enjoyment of life, the jury charge on damages under the survival claim reflects that the trial judge did not effectively communicate to the jurors the items for which they could compensate decedent's estate. We are unable to conclude that the jurors understood that they could award damages for disability and impairment or for lost wages. See Theobold v. Angelos, 40 N.J. at 295, 191 A.2d 465. The section of the verdict form entitled "ESTATE'S DAMAGES" set forth only three categories: medical expenses and funeral expenses, with amounts already determined, and a category entitled "Francis Coker's loss of enjoyment of life from Jan. 9, 1986 to Jan. 20, 1987." Further, the only jury instruction given regarding survival damages was a description of loss of enjoyment of life.
The jury award of $17,500.00 was clearly insufficient to compensate decedent's estate for over a year of lost wages, and *454 total physical impairment and disability, without considering the proferred element of loss of enjoyment of life's pleasures. "[T]he damage verdict is so disproportionate to the injury and resulting disability as to shock the court's conscience and convince it that to sustain the award would be manifestly unjust...." Tronolone v. Palmer, 224 N.J. Super. at 97, 539 A.2d 1224 (citing Baxter v. Fairmont Food Co., 74 N.J. at 596, 379 A.2d 225).
Because a new trial is otherwise required as to the issue of damages, we need not consider the propriety of the additur allowed by the trial judge. In any event, we do note that a trial judge must carefully articulate the reasoning behind the addition in order to withstand later scrutiny. Tronolone, 224 N.J. Super. at 104, 539 A.2d 1224. Here, the reasoning of the trial judge in granting an additur was not detailed as sufficiently as we would expect.
Regarding the wrongful death award, the trial judge permitted the jury to apportion the amount recovered among the decedent's mother and two daughters. This produced an award of $25,000 to each daughter and no recovery for the mother. This procedure was improper and may have led to an unjust result.
New Jersey's wrongful death statute specifically establishes the proper procedure for awarding damages for wrongful death claims. It states:
The amount recovered in proceedings under this chapter shall be for the exclusive benefit of the persons entitled to take any intestate personal property of the decedent, and in the proportions in which they are entitled to take the same. If any of the persons so entitled were dependent on the decedent at his death, they shall take the same as though they were sole persons so entitled, in such proportions, as shall be determined by the court without a jury, and as will result in a fair and equitable apportionment of the amount recovered, among them, taking into account in such determination, but not limited necessarily thereby, the age of the dependents, their physical and mental condition, the necessity or desirability of providing them with educational facilities, their financial condition and the availability to them of other means of support, present and future, and any other relevant factors which will contribute to a fair and equitable apportionment of the amount recovered. [N.J.S.A. 2A:31-4 (emphasis added)].
*455 Pursuant to this statute, damages for wrongful death must be assessed by the jury in a lump sum. See McMullen v. Maryland Casualty Co., 127 N.J. Super. 231, 238, 317 A.2d 75 (App.Div. 1974), aff'd sub nom. McMullen v. Conforti & Eisele Inc., 67 N.J. 416, 341 A.2d 334 (1975); New Jersey Model Jury Instructions § 6.15 (3d. ed. 1990), p. 7. "Once the lump-sum recovery is obtained, whether by way of settlement or judgment, the trial court must hold a hearing without a jury in order to apportion the fund equitably among the members of the class entitled to share in it." McMullen, 127 N.J. Super. at 238, 317 A.2d 75 (citing Jurman v. Samuel Braen, Inc., 47 N.J. 586, 598, 222 A.2d 78 (1966), and Suarez v. Berg, 117 N.J. Super. 456, 285 A.2d 68 (App.Div. 1971)); see also Wolff v. Mercer Medical Center, 220 N.J. Super. 360, 532 A.2d 265 (App.Div. 1987).
It was plain error for the judge to delegate to the jury his statutory duty to apportion the award. Further, he did not fully inform the jury to consider the various factors required by the statute in apportioning the award. N.J.S.A. 2A:31-4. In addition, no opportunity was presented for independent representation of the infants' interests or for the offering of proof as to all relevant factors.
We are not able to find the error was harmless thereby permitting the court to apportion the $50,000 awarded by the jury. If the jury believed that decedent sent $200 per month to MaryAnn and $130 per month support to Victoria, then the $50,000 would cover only a period of approximately twelve years, or roughly until the time that the two would reach majority. This would not appear to take into account inflation, future expenses, including education, and other paternal benefits, such as advice, comfort, and society. See generally Green v. Bittner, 85 N.J. 1, 424 A.2d 210 (1980).
Likewise, even if the jury did not find any merit to decedent's mother's claim for loss of monetary support, she, nonetheless, clearly suffered some pecuniary loss considering the close relationship she enjoyed with her son, their continuous and frequent communication, and the advice in important matters *456 which was rendered to her by decedent.[1] The low amount awarded by the jury, when considered in light of the improper procedure followed, compels us to conclude that a new trial on all damages is required to avoid manifest injustice. Tronolone, 224 N.J. Super. at 97, 539 A.2d 1224.
We, therefore, affirm the judgment as to liability. We reverse the judgment as to damages and remand for a new trial consistent with this opinion.
NOTES
[1] Decedent was survived by two children; thus, his mother does not appear to be an eligible intestate beneficiary pursuant to N.J.S.A. 3B:5-4. Nevertheless, her presence in the case was not challenged, and the jury heard testimony regarding the loss suffered by the mother as a result of decedent's death. Because the propriety of admitting that testimony into evidence has been neither raised nor briefed, we do not address that issue on this appeal. See N.J.S.A. 2A:31-5 regarding assessment of damages by jury.