**ALLIANT HOSPITALS, INC. d/b/a Norton Hospital, Appellant,**

v.

**Kevin BENHAM, individually and as Parent and Next Friend of the Infant, Zachary T. Benham, and Kevin Benham as Administrator of the Estate of Zachary T. Benham, Deceased, and Estate of Zachary T. Benham, Appellees.**

No. 2002–CA–000517–MR.

Court of Appeals of Kentucky.

May 2, 2003.

C. Alex Rose, Russell H. Saunders, Karen L. Keith, Weber & Rose, P.S.C., Louisville, KY, for appellant.

F. Thomas Conway, Nicole H. Pang, Louisville, KY, for appellees.

Before COMBS, KNOPF, and TACKETT, Judges.

*OPINION*

KNOPF, Judge.

Soon after his birth on July 23, 1999, it became apparent that Zachary Benham had suffered brain damage. On Zachary's behalf, his parents, Angel[1] and Kevin Benham, sued first the doctor who performed the delivery and later the hospital, Norton Hospital in Louisville, where the delivery took place. The Benhams alleged that the doctor had misused a device, a vacuum extractor, that had caused cerebral bleeding, and that the attending nurses had failed to respond appropriately to signs that during labor the fetus had become dangerously distressed. Following a jury trial in Jefferson Circuit Court in December 2001, the doctor was exonerated, but the hospital was found liable and ordered to pay damages totaling more than three-million dollars. Of that total, the jury designated almost two-million dollars to compensate Zachary for his future medical expenses. On February 16, 2002, after entry of the judgment but while timely post-trial motions were pending, Zachary died. Thereupon the hospital moved that the award of future medical expenses be severed from the judgment. The trial court denied the motion by order entered March 6, 2002. It is from these rulings, the December 27, 2001, judgment and the order of March 6, 2002, that the hospital appeals. It contends that the trial court should have admitted into evidence a letter from Zachary's counsel to one of his testifying experts, that the court should not have awarded Zachary damages for pain and suffering, and that, when Zachary's death made it apparent that he would incur no additional medical expenses, the court should have amended the judgment accordingly. For the reasons that follow, we affirm the trial court's judgment.

The hospital predicated its defense on the theory that the fetus had likely suffered injury prior to labor before Angel came to the hospital, that the alleged signs of fetal distress during labor had not been as alarming as the Benhams maintained and did not indicate an injury at that time, and that the nurses had responded appropriately. As part of its support for this theory, the hospital sought to show that even the Benhams' counsel and medical experts had initially discounted the possibility of an intrapartum injury. This discounting was evidenced, the hospital argued, by the fact that the Benhams had first sued the doctor but not the hospital and that their experts' first disclosures had focused on the trauma allegedly caused by the vacuum extractor. The hospital showed the Benhams' initial complaint and the experts' interrogatory responses to the jury and questioned the experts extensively about the apparent change in their theory of how Zachary's injuries came about.

The principal expert against the hospital, Dr. Harlan Giles, responded that his theory had not changed. He had believed as soon as he had reviewed the various hospital records, he testified, that the baby had indeed been injured by the bleeding caused by the vacuum extractor, but also that he had been injured during labor when the supply of blood, and hence the supply of oxygen, to his brain had been interrupted.

In an attempt to impeach Dr. Giles's testimony, the hospital referred to a March 6, 2000, letter from the Benhams' counsel to a second doctor, Dr. Hermansen. The pertinent portion of the letter states,

---

1. Angel Benham died in February 2001 prior to trial.

Harlan [Dr. Giles] has advised me that there are periods of hyperstimulation, but that they are intermittent, and he also advises that there are intermittent late decelerations, and he does not believe the child's brain damage was caused by an hypoxic ischemic event during labor, but rather he believes the cerebral palsy is due to the bleed that began at delivery with the application of the vacuum extractor.

Without identifying the letter, the hospital quoted from it and asked Dr. Giles if he had not formerly expressed these opinions about the cause of Zachary's injury.

Dr. Giles denied having ever expressed those opinions. He testified that the quoted portion of the letter was not an accurate statement of his opinion at any time, that he had, in fact, believed then, in March 2000, and still believed at trial, that Zachary's brain damage had resulted in part from oxygen deprivation during labor. The hospital moved to introduce counsel's letter into evidence, but the trial court denied the motion on the ground that, as part of a pre-litigation expert consultation, the letter was privileged.

The hospital acknowledges that evidentiary rulings are left largely to the trial court's sound discretion,[2] but contends that in this instance the trial court abused that discretion. First, it argues, the letter should not be deemed privileged because counsel made a similar representation of Dr. Giles's opinion in other, post-litigation, letters. Even if the privilege applies, moreover, counsel waived the privilege when he permitted Dr. Hermansen to be deposed about it. Finally, the privilege should be narrowly cabined, the hospital asserts, because it conflicts with the trial court's fundamental obligation to find the truth.

With this last argument, at least, we agree. Courts have long sought the proper balance between CR 26.02's incorporation of the work-product rule, pursuant to which a lawyer's trial preparation is shielded from appropriation by his adversary, and its policy of facilitating meaningful cross-examination of expert witnesses.[3] As expert testimony has steadily assumed greater importance in our courts, the trend has been decidedly toward open discovery and disclosure of the materials, including a lawyer's work product, that a testifying expert considers.[4] Were we writing on a blank slate, therefore, we would not hesitate to find the letter at issue here admissible.

■ The slate is not blank, however. As the trial court correctly observed, in *Newsome v. Lowe*,[5] this Court held that pre-litigation expert consultations should be afforded the protection of the work-product rule and shielded from discovery. The shield was necessary, the Court believed, to enable and to encourage plaintiff's counsel to assess the client's claim prior to filing suit. The trial court did not abuse its discretion by applying this well established precedent. Nor do the hospital's other arguments change this result. The fact that other letters might not be entitled to the same protection does not change the status of this letter. And, contrary to the hospital's assertion, the Benhams did not waive the right to exclude the letter. At Dr. Hermansen's deposition and at all pertinent times thereafter, plain-

2. *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1988).

3. *Karn v. Ingersoll Rand*, 168 F.R.D. 633 (D.C. N.Dist.Ind., 1996).

4. *Id. Gall v. Jamison*, 44 P.3d 233 (Colo. 2002).

5. Ky.App., 699 S.W.2d 748 (1985).

tiff's counsel duly objected to its introduction into the case.

■ Even were we to conclude that the letter should have been admitted, moreover, the hospital would not be entitled to relief because there is little likelihood that the admission would have affected the outcome of the trial.[6] As noted above, in its extensive cross-examination of Dr. Giles, the hospital was able to confront him with the apparent change in his opinion and managed to let the jury know what counsel's letter to Dr. Hermansen said. Admission of the letter itself would have added little to this evidence, not enough to suggest a different result.

■ The hospital next contends that the trial court erred by permitting the jury to find that Zachary was entitled to general damages for pain and suffering. It preserved its right to appellate review of this issue both by seeking a directed verdict on the question of pain-and-suffering damages and by objecting to the instruction whereby the jury was authorized to find them. As the hospital notes, our Supreme Court has indicated that damages for pain and suffering should not be awarded to one who was totally unconscious of his injuries.[7] Courts in other jurisdictions have applied this rule to deny such damages to individuals so neurologically impaired as to be left without any awareness of pain or loss.[8] The hospital maintains that the Benhams failed to prove that Zachary could perceive pain. On the contrary, it contends, the evidence of his severe brain injury suggested that he was left without that ability. We disagree.

In *Vitale v. Henchey*,[9] our Supreme Court stated that, although inappropriate if the plaintiff was totally unconscious, damages for pain and suffering "may be awarded ... 'if the injured person was "partly conscious," had intervals of consciousness, or was conscious for a short time before death.'"[10] During his testimony, Kevin Benham presented Zachary to the jury. Although Zachary was obviously impaired, he was awake and responsive to some extent to his surroundings. Clearly, he was at least partly conscious. Kevin testified that if he did not tend to Zachary promptly in the mornings, Zachary would let his displeasure be known. Kevin also testified, and he was confirmed in this by the experts, that as a result of his injuries Zachary was subject to seizures and was obliged to undergo uncomfortable treatments. This evidence was sufficient, we believe, to permit a rational juror to find that Zachary was capable of experiencing pain and distress, and that his injuries pained and distressed him.

Because we are convinced that the evidence permitted a finding that Zachary experienced pain as a result of his injury and thus affirm the award of pain-and-suffering damages on this ground, we need not address Kevin's contention that general damages may be awarded even in the absence of conscious pain to compensate the victim for so called hedonic losses.[11]

6. CR 61.01.

7. *Vitale v. Henchey*, Ky., 24 S.W.3d 651 (2000).

8. *Keene v. Brigham and Women's Hospital, Inc.*, 56 Mass.App.Ct. 10, 775 N.E.2d 725 (2002); *McDougald v. Garber*, 73 N.Y.2d 246, 538 N.Y.S.2d 937, 536 N.E.2d 372 (1989).

9. *supra.*

10. *Id.* at 659 (citations omitted).

11. *See Eyoma v. Falco*, 247 N.J.Super. 435, 589 A.2d 653 (1991) (General damages may be awarded to compensate for the permanent loss of faculties regardless of the victim's consciousness of the loss.); *but cf. Keene v. Brigham and Women's Hospital, supra* (Hedonic damages are an element of pain and suffering

Finally, the hospital contends that Zachary's death less than two months after trial entitles it to relief from that portion of the judgment awarding him almost two-million dollars for future medical expenses. This contention puts in conflict two of our law's more fundamental principles: that litigation should have an end in a reliable judgment and that courts of law, to the extent feasible, should seek the truth and seek to base their judgments thereon. The trial court resolved this conflict in favor of stable judgments.

The conflict is embodied in our rules, of course, in CR 60.02. Pursuant to that rule, a trial court has authority to relieve a party from a final judgment [12] upon certain specified grounds including "(e) ... it is no longer equitable that the judgment should have prospective application," and under the catchall provision, "(f) any other reason of an extraordinary nature justifying relief." These are the provisions the hospital invoked in its motion. Under neither of them is the hospital entitled to relief.

Subsection (e) is inapplicable, we believe, because a simple judgment for money damages, even one not yet enforced, does not have "prospective application." The federal courts, whose rule in this regard is like ours, have reserved that phrase for judgments, such as those granting an injunction, that "involve the supervision of changing conduct or conditions and are thus provisional and tentative." [13] A money judgment, by contrast, closes the book on a past wrong and leaves the court with no further involvement. We find this federal precedent persuasive and consistent with what little Kentucky precedent there seems to be. [14]

Subsection (f) of CR 60.02, the catchall provision, can apply only if none of that rule's specific provisions applies. [15] We are persuaded that one of the specific provisions does apply, and thus that subsection (f) does not. Subsection (b) of CR 60.02 is the specific provision we believe applicable. That provision allows for relief from a final judgment upon the ground of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59.02." The hospital contends that newly available evidence about Zachary's need for medical care should be allowed into the case. Generally, of course, "newly discovered evidence" is limited to evidence in existence at the time of trial and does not

and may not be awarded unless the victim consciously anguishes over lost capabilities.).

12. The hospital asserts that the judgment is not final or should not be accorded the respect due a final judgment because, when Zachary died and the hospital moved to sever the award of medical expenses, post-trial motions pursuant to CR 59 were still pending. Under our rules, however, a judgment is final upon entry by the clerk. CR 58. A timely motion pursuant to CR 59 suspends the judgment's operation for various purposes, but, unless and until granted, it does not change the judgment's character. *Kentucky Farm Bureau Insurance Company v. Gearhart*, Ky. App., 853 S.W.2d 907 (1993). The relief the hospital seeks, therefore, as acknowledged by its invocation of CR 60, is relief from a final

judgment with all the attendant policy concerns.

13. *Twelve John Does v. District of Columbia,* 841 F.2d 1133, 1139 (D.C.Cir.1988) (quoting from *United States v. Swift and Company,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932)); *DeWeerth v. Baldinger,* 38 F.3d 1266 (2nd Cir.1994).

14. *See Cawood v. Cawood,* Ky., 329 S.W.2d 569 (1959) (Although this case suggests that an unsatisfied money judgment might be deemed to have prospective application, it holds only that a satisfied money judgment does not have such application.).

15. *Commonwealth v. Spaulding,* Ky., 991 S.W.2d 651 (1999).

extend to evidence arising after trial. This is likely why the hospital invoked subsection (f) rather than subsection (b), and we recognize that under either subsection the issues would be much the same. Our insistence on subsection (b), however, is not merely academic. The point is that subsection (f) was not intended to provide a means for evading the strictures of the other subsections. Be that as it may, the hospital argues that it is entitled to an exception to the general newly-discovered-evidence rule because the new evidence in this case arose soon after trial, is uncontested, and would lead to a substantial change in the result. The court's truth-finding imperative in these circumstances, the hospital contends, overrides the general need for finality.

There is some precedent for such an exception. In *Vanalstyne v. Whalen*,[16] for example, a successful plaintiff in a personal injury action was granted a new trial on the issue of damages when, a few weeks following the original trial, it became apparent that his injuries were more serious than they had previously appeared. The Massachusetts Appeals Court acknowledged the "mischief naturally flowing from retrials based upon the discovery of alleged new evidence," but, because "courts cannot close their eyes to injustice," concluded that the trial court had not abused its broad discretion.[17]

In Kentucky, however, support for such an exception is merely hypothetical at best. In *Woods v. Kentucky Traction and Terminal Company*,[18] the former Court of

Appeals reversed an order granting a new trial on the ground of newly discovered evidence that had arisen after trial. The court did not base its decision solely on this fact, however, but upon its conclusion that the new evidence did not render a different result sufficiently likely. In a proper case, the Court suggested, although it would be a rare case, sufficiently probative evidence arising after trial could provide grounds for relief.

Similarly, in *Cawood v. Cawood*,[19] the former Court of Appeals emphasized the need for finality and rejected a claim that a post-trial change of circumstances justified reopening a final alimony judgment. The Court left open the possibility, however, "that a change of physical condition, occurring within a comparatively short time after an alimony judgment, might under some circumstances give rise to equities justifying the setting aside of the judgment."[20]

These cases lend the hospital only the faintest support, and even that support was called into question in *Stephens v. Kentucky Utilities Company*,[21] where our Supreme Court, acknowledging no possible exception, cited *Woods* and *Cawood* for the proposition that only evidence in existence before judgment would support a newly-discovered-evidence motion.

In *Fowler–Propst v. Dattilo*,[22] a real-property case in which the trial court had ordered a new damages trial on the basis of post-trial evidence, the Court of Appeals of New Mexico addressed the question "of when, if ever, evidence that comes into

---

**16.** 15 Mass.App.Ct. 340, 445 N.E.2d 1073 (1983).

**17.** *Id.* at 1079–80 (citations and internal quotation marks omitted). *See also Fowler–Propst v. Dattilo*, 111 N.M. 573, 807 P.2d 757 (App., 1991) (collecting cases).

**18.** 252 Ky. 78, 65 S.W.2d 961 (1933).

**19.** *supra.*

**20.** *Id.* at 571.

**21.** Ky., 569 S.W.2d 155 (1978).

**22.** 111 N.M. 573, 807 P.2d 757 (App., 1991).

existence after trial can be considered 'newly discovered evidence' within the meaning of Rule 1–060(B)(2) [New Mexico's identical version of CR 60.02]."[23] It held that "[a] new trial should not be granted solely on the ground that a post-trial event undercuts a prediction which formed the basis for the assessment of damages."[24] Emphasizing the institutional need for reliably final judgments, the court considered what it deemed the parties' expectations in cases involving future damages:

> In those cases, ... everyone knew that the fact finder was not determining a historical truth but was making an estimate, a prediction of future events, to establish damages. For example, in personal injury litigation, experts attempt to assess the injured party's condition in order to predict future disability, medical care, pain and suffering, etc. Both parties know that their expert testimony may be proved wrong by subsequent events. Yet neither expects a favorable damage award to be set aside when future events show that the prediction was inaccurate. Such adjustments could go on indefinitely, leading to multiple reopening of a single case. Parties take their chances based on the information existing at the time of trial.[25]

The court continued by quoting from our former Court of Appeals' opinion in *Woods v. Kentucky Traction and Terminal Company, supra:*

> The courts, upon considerations of public policy, as a rule are not favorable to the granting of new trials on newly discovered evidence claiming to show a changed condition subsequent to trial ... "particularly where verdicts rest in any degree upon expert evidence as to future resultant conditions reasonably to be apprehended." Especially are they inclined to regard with disfavor evidence as to subsequent events disproving the character or extent of bodily injury for which recovery was had, as where subsequent to a trial for damages for personal injuries something occurs showing that the bodily condition of plaintiff was not such in fact as was supposed to be by the jury.[26]

Denying the hospital's CR 60.02 motion in this case, the trial court noted that its truth-finding function had been fulfilled. The jury had based its assessment of Zachary's likely need for future medical treatment on an array of highly qualified expert testimony. It had been as well informed on that difficult question as the considerable efforts and expenditures of the parties had been able to make it. The jury's assessment could not be perfect, obviously, but the process had been fair and was calculated to reach as accurate a result as possible. The court could do no more. It is in society's interest then, the trial court believed, that final judgments emerging from that process bring the litigation to an end. We agree. As discussed above, our courts have long recognized that the social and institutional interest in reliable, final judgments is an overriding one. The trial court did not err or abuse its discretion by recognizing that overriding interest here and denying the hospital's motion to disturb a final judgment on the basis of evidence arising after the judgment.

In sum, the trial court erred neither by excluding from evidence a consultative let-

**23.** *Id.* at 759.

**24.** *Id.* at 757.

**25.** *Id.* at 760.

**26.** *Id.* at 760.

ter from plaintiff's counsel nor by awarding damages·for pain and suffering nor by denying appellant's motion to sever from the judgment an award of future medical expenses. Accordingly, we affirm the December 27, 2001, judgment of the Jefferson Circuit Court.

TACKETT, Judge, concurs.

COMBS, Judge, concurs in part, dissents in part, and files separate opinion.

COMBS, Judge, concurring in part and dissenting in part:

This tragic case was carefully and for the most part correctly decided by the trial court. I agree with the sound legal analysis of the majority opinion and concur on all issues except the disposition of the award of damages for future medical expenses. I am compelled to agree with the hospital's argument that that item of damages should be severed from the judgment. However, I would not disturb any other portion of the judgment.

Surely finality in judgments is a doctrine devoutly to be pursued in our handling of such issues, and thus we defer whenever possible to the sound discretion of the trial court with respect to post-judgment motions. In scanning several possible relevant provisions of CR 60.02, the majority opinion rejects reliance upon subsection (b) (newly discovered evidence) by noting that that provision normally pertains to evidence in existence but undiscovered at the time of trial rather than to evidence arising after trial.

This gravely impaired infant died very soon after trial—before the disposition of post-trial motions. The reality of imminent death was undoubtedly present and pending during the trial; however, the tragedy did not become manifest until the trial ended. No reasonable amount of diligence could have led to a discovery of a matter that lay exclusively within divine knowledge rather than human perception. Thus, I cannot agree with the majority opinion that subsection (b) is inapplicable.

Additionally, this case appears to fall squarely into exception (e) of CR 60.02, which permits a court to grant relief from a final judgment upon the ground that "it is no longer equitable that the judgment should have prospective application...." While this award of damages for Zachary's future medical expenses was a final and liquidated sum, it would be patently unrealistic to deny that the timing of his death rendered impossible the use of any portion of the award for its intended purpose. Thus, it would be inequitable as contemplated by subsection (e) (and as a matter of common sense) to enforce an award of damages for future care when that possibility ended immediately after trial.

The unique circumstances of this case dictate the wisdom of resort to CR 60.02(b) and (e) in order to avoid the injustice that would inevitably result if this portion of the award were allowed to stand. I do not believe that we will open Pandora's box (as counsel for appellees so effectively warned during oral argument before this panel). On the contrary, I believe that a realistic approach to the intended use of a damages award will safeguard the public purpose of matching adequate compensation for actual injury.