CSX TRANSPORTATION, INC., Appellant

v.

Stephen P. RYAN, Judge, Jefferson Circuit Court, Appellee

and

Scott Kolter, Real Party in Interest.

No. 2005–SC–0275–MR.

Supreme Court of Kentucky.

May 18, 2006.

Edward H. Stopher, David T. Klapheke, Julie G. McKeel, Boehl, Stopher & Graves, LLP, Louisville, Counsel for Appellant.

Stephen P. Ryan, Judge, Jefferson Circuit Court, Louisville, Counsel for Appellee.

Kenneth L. Sales, Paul J. Kelley, Joseph D. Satterley, Sales, Tillman & Wallbaum, Catlett & Satterley, Louisville, Counsel for Real Party in Interest, Scott Kolter.

JOHNSTONE, Justice.

In 2003, Scott Kolter filed an action in the Jefferson Circuit Court against Appellant, CSX Transportation, Inc., seeking damages under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60. Kolter claimed that he sustained permanent, irreversible brain damage causing cognitive impairment and mood disorder as a result of his exposure to cleaning solvents while he was employed at CSX. Prior to filing the lawsuit, Kotter was examined by Dr. Martine RoBards, an expert retained by Kolter's counsel, on four occasions between February and May 2001. Dr. RoBards administered a battery of neuropsychological tests and wrote a report that was eventually produced to CSX, along with the raw data from the tests she administered.

In May or June of 2004, Kolter's counsel retained another neuropsychologist, Dr. Lisa Morrow, who administered a second round of tests.[1] Dr. Morrow was identi-

---

1. Although the briefs make reference to the fact that Dr. RoBards became unavailable to testify due to serious health problems, it is not clear whether Dr. Morrow was retained as a "replacement" expert, or merely an additional expert. CSX does point out that Dr. Mor-

fied as a testifying expert in the Plaintiff's Expert Witness List filed July 14, 2004. The list indicated that Dr. Morrow would testify regarding Kolter's neuropsychological condition "based upon the testing she performed."

On September 9 and 10, 2004, Dr. Barry Gordon performed a court-ordered independent neurological and neuropsychological evaluation of Kolter pursuant to CR 35.01 on behalf of CSX. Dr. Gordon administered a battery of tests similar to those conducted by Dr. RoBards. Kolter thereafter filed a motion to compel CSX to produce Dr. Gordon's report, raw test data, and "all documents created during the examination of Plaintiff including but not limited to any taped recording of the interview of Mr. Kolter." Following a hearing on October 18, 2004, the trial court ordered Dr. Gordon to produce his report and raw test data to Kolter's neuropsychologist, Dr. RoBards, and ordered Kolter to "produce the data from all tests taken by [Kolter] to CSX's neuropsychologist, Dr. Edelson." While Kolter eventually produced the report and raw data from Dr. RoBards, he refused to disclose any report or results from Dr. Morrow.

On November 3, 2004, Kolter's counsel informed CSX that Dr. Morrow had been withdrawn from the witness list and, as a result, her report and test results were privileged attorney work product. Kolter thereafter filed a motion for a protective order asserting the same position. Following a hearing, the trial court denied Kolter's motion and ordered him to produce "copies of Dr. Morrow's raw test data and report on Plaintiff." The trial court reasoned:

Pursuant to CR 35.01, Dr. Barry Gordon performed a neuropsychological evaluation of Plaintiff. Plaintiff request-

ed and was given Dr. Gordon's raw test data and report. Under these circumstances, CR 35.02(1) allows discovery of a like report of any previous examination of the same condition of Plaintiff. CR 26.02(4)(b), the basis for Plaintiff's requested protective order, specifically exempts discovery allowable under CR 35.02.

Kolter refused to comply with the court's order and instead filed a motion to alter, amend or vacate, arguing for the first time that Dr. Morrow never prepared a report and further that CR 35.02 did not apply to raw data of examiners. The trial court again ordered the production of Dr. Morrow's test results and report, if one existed.

Kolter subsequently filed a petition for a writ in the Court of Appeals seeking an order directing the trial court to grant a protective order with respect to Dr. Morrow's report and raw data. While noting that this case involves issues of first impression, the Court of Appeals concluded that the language of CR 35.02(1) requires only that written reports be exchanged by the litigants, not test results or other separate documents also prepared by the examining physician. Interestingly, the court acknowledged the discovery difficulties that may arise by construing the rule to require only the production of a report, but noted that "CR 35.02(1) in its current form cannot be construed in a broader manner." CSX thereafter appealed to this Court as a matter of right. We now reverse the decision of the Court of Appeals.

■ At the outset, we reiterate that a writ is an extraordinary and discretionary remedy. Because this is a request for a writ where the trial court is alleged to be acting within its jurisdiction but proceeding erroneously, Kolter must demonstrate

row has been retained by Kolter's counsel as a testifying expert in a number of cases.

that there is no adequate remedy by appeal or otherwise, and that he will suffer irreparable injury if a writ is not granted. *See Hoskins v. Maricle,* 150 S.W.3d 1, 10 (Ky.2004). The Court of Appeals held, as an initial matter, that Kolter satisfied these prerequisites, noting that "Kolter could suffer irreparable harm if the information he seeks to shield from discovery is ultimately held to be privileged after it has already been produced."

Notwithstanding Kolter's contention of irreparable harm, we are of the opinion that the question raised herein merits consideration in this proceeding. "[T]he proper construction and application of the Rule in question [CR 35.02] is important to the orderly administration of our Civil Rules.... We have not heretofore had occasion to pass upon its meaning or effect. Under these circumstances, a decision would be of value to the Bench and Bar of Kentucky." *Bender v. Eaton,* 343 S.W.2d 799, 802 (Ky.1961). Accordingly, the absence of any reported Kentucky precedent construing an important component of CR 35.02 in and of itself would justify a review of the merits of the case. *See Sexton v. Bates,* 41 S.W.3d 452 (Ky. App.2001).

Turning to the merits of the case, CR 35.02(1) provides, in pertinent part:

If requested by the party against whom an order is made under Rule 35.01 or the person examined, the party causing the examination to be made shall deliver to that person or party a copy of a detailed written report of the examining health care expert setting out all findings, including results of all tests made, diagnoses and conclusions, together with like reports of all earlier examinations of the same condition. After delivery, the party causing the examination shall be entitled upon request to receive from the party against whom the order is made a like report of any examination, previously or thereafter made, of the same condition....

■ CR 35.02 was intended to facilitate a reciprocal exchange of physicians' reports at the examined party's option, "to eliminate uncertainty concerning the medical aspects of the cause and permit the preparation of an intelligent and informed defense." *State v. Seier,* 567 S.W.2d 127, 128 (Mo.1978).[2] Should the examined party not elect the mutual exchange by requesting a copy of the examining physician's report, discovery must proceed through other methods. *See* CR 26. However, if CR 35.02 is triggered by the examined party, it requires production of a "like report of any examination, previously or thereafter made," contemplating a document setting forth the examiner's "findings, including results of all tests made, diagnoses and conclusions, together with like reports of all earlier examinations of the same condition." CR 35.02(1). This is precisely the same standard as that to which the party causing the independent medical examination must adhere in producing a report upon request to the examined party. *See State v. Clark,* 881 S.W.2d 627 (Mo.1994).

As did the Court of Appeals, we reject Kolter's argument that because his request for Dr. Gordon's report and raw data was made pursuant to CR 26, the CR 35.02 duty to exchange similar information was not triggered. Dr. Gordon's examination of Kolter was made pursuant to CR 35.01, and CR 35.02 does not require that a request for a report of that examination be

**2.** In *Seier,* the Missouri Supreme Court was interpreting Missouri Supreme Court Rule 60.01(b) which is analogous to CR 35.02.

made by specifically invoking CR 35.02. Clearly, by choosing to compel the production of Dr. Gordon's IME report and by receiving it, Kolter triggered his CR 35.02(1) reciprocal obligation to produce reports of the same condition generated by physicians who examined him at his own request.

As Kolter's obligation to produce a "like report" from Dr. Morrow is unavoidable under CR 35.02(1), the question necessarily becomes what that term encompasses. Kolter defends that CR 35.02 only requires the production of a like *report* and that Dr. Morrow never prepared a report (despite counsel's vigorous attempt in the trial court to obtain an order protecting the disclosure of her report). Kolter argues that the remedy for failing to produce a report is the exclusion of the expert's testimony at trial, which, in this case, is a moot point as Kolter has removed Dr. Morrow from the witness list. Nonetheless, Kolter concludes that the available sanction both ensures that CSX is not prejudiced at trial and protects Kolter's "work product." We disagree.

■ CR 35.02(1) clearly states that upon request, the party causing the CR 35.01 independent medical exam has an absolute obligation to produce "a detailed written report of the examining health care expert setting out all findings, *including results of all tests made*, diagnoses and conclusions . . . ." (Emphasis added). Construing the plain language of the rule, a "like report" can only be interpreted as the substantial equivalent of that required to be produced by the examining party. As such, it necessarily encompasses the results of all tests made. Within the context of CR 35.02, if an expert declines to issue a written report, the opposing party would nevertheless be entitled to that expert's test results. Further, we can dis-

cern absolutely no difference between "test results" and "raw test data."

We believe such an interpretation of CR 35.02(1) is reasonable because it is consistent with the purpose assigned to CR 35.01 to maintain a level playing field between the parties. "To conclude otherwise would permit [plaintiff] to arrange unlimited medical examinations and reports and suppress those he might think unfavorable merely by characterizing the doctors who prepared them as advisers to counsel and promising not to call them as witnesses." *Queen of Angels Hospital v. Superior Court*, 57 Cal.App.3d 370, 375, 129 Cal. Rptr. 282 (Cal.App.1976). *See also Coates v. AC & S. Inc.*, 133 F.R.D. 109 (E.D.La. 1990).

We need not address CSX's argument that by designating Dr. Morrow as a testifying expert, any work product privilege was permanently waived under Rule 26.02(4)(a)(i). Dr. Morrow physically examined Kolter and, as a consequence, the report of her examination becomes discoverable under CR 35.02(1). And, that is true regardless of the fact that Kolter will not call her as a trial witness, as the rule makes no exception for non-testifying experts. We note that CR 26.02(4)(b) expressly includes a CR 35.02 exemption, which would become meaningless were we to take Kolter's argument to its logical conclusion. *Morrow v. Stivers*, 836 S.W.2d 424, 428 (Ky.App.1992). Furthermore, Kolter's reliance on *Alliant Hospitals, Inc. v. Benham*, 105 S.W.3d 473 (Ky.App.2003), *Morrow v. Stivers, id.*, and *Newsome v. Lowe*, 699 S.W.2d 748 (Ky.App.1985), is misplaced as each concerned the confidentiality of pre-litigation examinations.

Therefore, we conclude that when CR 35.02(1) is triggered by the examined party's request for production of the independent medical examiner's report, that party has a reciprocal obligation to produce a

like report of all similar examinations. With or without a written report, the opposing party is still entitled to the test results and raw data obtained by the experts in question.

Accordingly, the decision of the Court of Appeals herein is reversed and the order of the Jefferson Circuit Court compelling Kolter to produce "copies of Dr. Morrow's raw test data and report" is reinstated.

All concur.