**Guy SNODGRASS, Appellant,**

v.

**Lisa SNODGRASS, Appellee.**

**No. 2007–CA–001974–MR.**

Court of Appeals of Kentucky.

Oct. 16, 2009.

Jonathan S. Ricketts, Louisville, KY, for appellant.

Melinda A. Murphy, Richmond, KY, for appellee.

Before ACREE, CLAYTON and KELLER, Judges.

## OPINION

ACREE, Judge.

Guy Snodgrass appeals from an order of the Madison Circuit Court denying relief pursuant to Kentucky Rules of Civil Procedure (CR) 60.02(f) by which he sought to amend language in his divorce decree relating to the division of his military retirement benefits. Because the denial of his motion was error, we vacate the order and remand the case for further proceedings.

### FACTS AND PROCEDURE

Guy had been in the military for about four years when he and Lisa Snodgrass (now Byerly) were married on May 12, 1985. In August 1997, the couple separated. Just before Christmas 1998, while Guy was deployed overseas, Lisa filed a petition to dissolve the marriage.

Because Guy was in Germany, between deployments to Bosnia and Kosovo, it was not practical to serve him with process. Lisa's attorney prepared and mailed to Guy a waiver of service of process and entry of appearance. Guy signed the document and filed it on February 9, 1999, thereby waiving the need for Lisa to comply with CR 4. This allowed the Madison Circuit Court to exercise *in personam* jurisdiction.[1] Guy also filed a separate response admitting the averments in the petition with one exception—the division of the military retired pay that he was not yet eligible to receive. That is the focal point of this appeal.

The petition and response resulted in the parties' agreement regarding many matters that can sometimes be contentious in divorce. The parties agreed Lisa should have custody of their two minor children, Guy should have reasonable visitation, and he should pay child support in accordance with Kentucky Revised Statutes (KRS) 403.212. They agreed there was no marital debt, and, significantly, even agreed that their "[m]arital property has already been divided except for [Guy's] retirement plan through the military."

Where the parties disagreed, the disagreement seemed minor. Lisa asked "[t]hat the court award [Lisa] one half of [Guy's] retirement benefit." Guy responded by requesting that the court award Lisa "46% of [his] retirement benefit per the Kentucky Guidelines."

On March 9, 1999, Lisa's counsel filed a motion, to be heard on March 30, 1999,

---

1. The pleading states: "Comes the RESPONDENT, GUY SNODGRASS, and states that he enters his appearance and waives service of process, but wishes to be served with a copy of all pleadings filed herein."

asking the court to set the case for final hearing. The overseas address shown on the motion's certificate of service is not the same address Guy provided in his response to the petition.[2] The record does not reflect that Guy ever received actual notice of Lisa's motion to set his case for final hearing.

When March 30, 1999, arrived, Lisa's counsel appeared before the Madison Circuit Court's domestic relations commissioner (DRC). According to her motion, her appearance before the DRC was to obtain the final hearing date.[3] However, instead of *setting* a date for the final hearing, the DRC *conducted* the final hearing that day. Lisa's counsel clearly anticipated that the hearing would occur on March 30 because she had her client with her and had prepared a Form AOC–245, entitled "Findings of Fact and Conclusions of Law," as is common in domestic relations practice. However, nothing in the record indicates that Guy was notified that the final hearing would, in fact, occur on March 30, nor did he participate—or apparently have the opportunity to participate, either personally or by counsel—in that final hearing which proceeded despite his absence. Nor does the record indicate any thought was given to his participation by telephone.

Unopposed, Lisa's counsel first presented the DRC with a form entitled "Waiver of Recording" of the final hearing. Guy, of course, was not there to voice his preference on this issue. In the space on this waiver form provided for Guy's signature

or that of his attorney, the DRC wrote "Did not appear." The result, in any event, is that the only record we have of the final hearing is the DRC's recommendation to the circuit court.

Lisa's counsel presented the completed Form AOC–245 to the DRC. In the blank on the form entitled "Date summoned," Lisa's counsel wrote, "Waiver—signed 1–22–99," accurately reflecting Guy's submission to jurisdiction.

Lisa's counsel also indicated on the form that Guy had been given notice of the final hearing on March 8, 1999. However, March 8, 1999, is merely the date Lisa's counsel sent notice of the motion *to obtain* a date for the final hearing. Again, because it was sent to a different address, there is nothing in the record that indicates Guy ever received the March 8 notice at all, and certainly nothing to indicate that he had notice the final hearing itself would take place on March 30.

On the line denominated "Military status proved," Lisa's counsel wrote, "Respondent in Army." To this the DRC added, "waiver and agreement." However, we find nothing in the record supporting a finding that Guy waived either his right to participate in the final hearing, or his right to have the hearing recorded, or any other right or protection arising on account of his military service.

Once completed by the DRC, the Form AOC–245 became his recommendation to the trial court. The DRC did not directly

**2.** The petition, filed December 23, 1998, states that Guy's "actual whereabouts at this time is [sic] unknown to the Petitioner." The address Guy provided in his February 9, 1999 response to the petition is "CMR 438, Box 661, APO, AE 09111." On March 8, 1999, Lisa served Guy with her motion to set the case for a final hearing. It was not sent to the address Guy provided. Instead, the mo-

tion was sent to "Commander, HHC 1st AD, Attn: G2 Terrain, AETN–THB–TT, Unit 24309, APO AE 09252."

**3.** Specifically, Lisa "move[d] that the court hold a final hearing in the within dissolution action" and the notice states "that the within motion will come on for hearing before [the DRC] on March 30, 1999."

or separately address Guy's military retired pay. Consequently, no distinction is made between the marital and nonmarital portions of Guy's retired pay. The recommendation simply includes a general statement that recommended dividing "Property matters per Respondent's Response." Such property matters necessarily included Guy's future contingent right to receive military retired pay once, and if, he served twenty years.

Based on the DRC's recommendation, Lisa's attorney drafted a decree of dissolution and submitted it to the Madison Circuit Court.[4] That decree, entered by the court on April 14, 1999, awarded to Lisa "46% of [Guy's] retirement benefit from the United States Military."

The record reflects no further activity for more than six years.[5]

In March 2005, eight months before Guy retired, Lisa obtained a blank Department of Defense (DoD) Form 2293, entitled, "Application for Former Spouse Payments from Retired Pay." She completed the form which, in pertinent part, states:

I request payment of: ... (3) a division of property in the amount of $_____, or *46* percent of disposable[6] retired pay per month.

(Emphasis reflects the blank filled in by Lisa).

Lisa submitted this form[7] to the Defense Finance and Accounting Service (DFAS), the agency charged with administering and distributing military retired pay. DFAS sent a letter to Lisa acknowledging receipt of her application and stating that "Regulations require that we notify the [service] member of your application and that he be given 30 days to provide information regarding the status of the court order." While Guy acknowledges receipt of this notification, the record does not indicate when he received it or whether he attempted to provide any information to DFAS.

We pause here to emphasize the result Lisa's submission of this form had on the distribution of Guy's military retired pay. By stating she was entitled to "46 percent of disposable retired pay," Lisa made no distinction between the nonmarital and

4. The divorce predated the creation of the Madison Family Court to which this case was subsequently reassigned.

5. There is one minor exception however. In accordance with the DRC's recommendation, the trial court ordered Guy to attend parenting classes as a condition of granting him visitation rights with his children. The record shows that in the summer of 1999, Guy complied with the order by completing eight hours of parenting classes in Germany. Lisa was not ordered to attend parenting classes.

6. Military retired pay is distributed to former spouses of military members in accordance with the Uniformed Services Former Spouses' Protection Act (USFSPA), 10 United States Code (U.S.C.) § 1408. "Disposable retired or retainer pay," as defined in 10 U.S.C. § 1408, is simply the retired pay the Defense Finance and Accounting Service (DFAS) sends to the

retiree after the government deducts: (A) what was previously overpaid by the government to the retiree while a service member, (B) forfeitures resulting from military discipline, (C) portions of the retired pay attributable to disability payments to the service member who retires for reasons of physical disability, and (D) annuities set up by the service member for the benefit of his spouse or children. 10 U.S.C. § 1408(a)(4)(A)-(D). The wording of the federal statutes themselves assures that DFAS will make the distribution only from the disposable retired or retainer pay.

7. No copy of the decree is attached to the copies of this form which Lisa has filed with the family court and with this Court. Page two of the form asks the applicant to check a block if a court order is attached and that block is not checked. The presumption is that she did not attach the decree.

marital portions of Guy's retired pay. Therefore, as the Madison Family Court noted in its September 4, 2007 order, the effect of Lisa's communication with DFAS is that she has been receiving "a robust 82% of the marital portion of the benefit" and Guy receives only 18%.

On October 25, 2005, just before Guy retired, he secured legal counsel who filed a motion for relief pursuant to CR 60.02(f). Guy sought modification of the decree that DFAS interpreted as meaning Lisa was entitled to 46% of the *total* amount of Guy's retired pay without regard for what the family court acknowledged was Guy's right to 100% of the nonmarital portion of his retired pay.

Guy's motion was originally noticed to be heard on October 31, 2005, but was passed at the request of Lisa's counsel and re-noticed for November 14, 2005. When the family court called Guy's motion on November 14, Lisa's counsel told the trial court she had not yet filed a response. The court again continued the hearing until December 5, 2005, to allow time for that response.

Four days after Guy's motion was passed for the second time, Lisa executed an affidavit that Guy was in arrears on his child support in the amount of $2,971.86. The parties' oldest child had turned eighteen on March 12, 2005, eight months earlier. However, the decree did not provide for termination or reduction of any portion of the child support award for that or any other reason. On December 1, 2005, based on Lisa's affidavit, the Cabinet for Families and Children (Cabinet) moved to intervene in the Snodgrass divorce. The motion was noticed to be heard on December 13, 2005.

The Cabinet did not serve Guy's counsel with its motion to intervene despite his having entered an appearance more than a month earlier in October, but did serve notice to Lisa's new counsel, whose own November 4, 2005 entry of appearance included Guy's counsel in its certificate of service. The Cabinet sent notice to Guy personally at an address in Georgia. Unfortunately, Guy was not in Georgia because he had retired by that time and moved to Virginia. According to the transcript of the December 13, 2005 hearing, Guy had just purchased a house there. Lisa stated that Guy had provided her with the address but she could not remember what it was. Guy apparently did eventually receive the notice because, according to the Cabinet's representative, Guy called him from Virginia just before the hearing—too late to make an appearance personally or by counsel.

It took time to resolve the child support issues but, by May 2, 2006, the parties had entered into an agreed order reflecting the changes and modifying child support. An agreed order, terminating all child support upon the youngest child's graduation from high school, was entered a year later on May 4, 2007.

In the meantime, before the Cabinet intervened, the trial court was told that the parties were working out the issue of the confusion regarding Guy's military retirement pay. On December 5, 2005, when the trial court called the case on the military retired pay issue, the parties' counsels stated that they would submit an agreed qualified domestic relations order (QDRO) to resolve it. The trial court inquired about the status of the proposed agreed QDRO during the December 13, 2005 hearing on the Cabinet's motion, which Guy did not attend. Lisa herself reaffirmed that the parties still intended to submit an agreed QDRO. However, nothing was ever agreed upon or submitted to the

court.[8]

Guy eventually gave up the possibility of an agreed QDRO. After the child support issues were finally resolved in the summer of 2007, he re-noticed his motion regarding his retirement pay. Lisa finally filed and served Guy with her response on the date of the hearing—more than a year and a half after Guy originally filed his motion. She urged the court to deny Guy's motion because: (1) he had chosen not to be represented by a lawyer in the dissolution, (2) had chosen not to appeal the decree, and (3) had waited six-and-one-half years to object to the language of the decree. Lisa did acknowledge, however, that since February 2006, she "has been receiving 46% of Respondent's gross [9] retiree pay;" that is, 46% of the marital portion and 46% of the nonmarital portion of Guy's retired pay. The Madison Family Court took the matter under submission.

On September 4, 2007, the family court ordered:

1. That [Guy's] Motion for Relief is **DENIED** except to the extent that, if [Lisa] is receiving any portion of [Guy's] retirement benefit attributable to [Guy's] post-divorce increases in rank and pay, [Lisa] shall cease to receive the amount that is reflective of such increases.

2. That [Lisa] should receive 46% of [Guy's] total monthly benefit as that benefit would have been had he retired when he did but at the same rank and pay levels that he had achieved at the time of the divorce.

(Emphasis in original). This appeal followed.

## STANDARD OF REVIEW

■ We review a family court's decision on all CR 60.02 motions under an abuse-of-discretion standard of review. *Bethlehem Minerals Co. v. Church and Mullins Corp.*, 887 S.W.2d 327, 329 (Ky. 1994). A successful movant must present to the court a "reason of an extraordinary nature justifying relief." CR 60.02(f). "What constitutes a reason of extraordinary nature is left to judicial construction." *Commonwealth v. Spaulding*, 991 S.W.2d 651, 655 (Ky.1999). Judicial construction must incorporate consideration of three specific factors. The first is that relief under subsection (f) of CR 60.02 will not be available unless "none of that rule's [other] specific provisions applies." *Alliant Hospitals, Inc. v. Benham*, 105 S.W.3d 473, 478 (Ky.App.2003), citing *Spaulding* at 655 ("CR 60.02(f) is a catch-all provision that encompasses those grounds, which would justify relief pursuant to writ of coram nobis, that are not otherwise set forth in the rule."). After determining that CR 60.02(a)-(e) do not apply, courts must consider two more factors: "(1) whether the moving party had a fair opportunity to present his claim at the trial on the merits, and (2) whether the granting of CR 60.02(f) relief would be inequitable to other parties." *Bethlehem, supra; Fortney v. Mahan*, 302 S.W.2d 842 (Ky. 1957).

## ANALYSIS—RIGHT TO CR 60.02(f) RELIEF

At first blush, the family court's order appears to deny Guy any relief at all.

---

8. Much later, in her June 2007 response to Guy's CR 60.02 motion, Lisa's counsel explained Lisa's reluctance to follow through with the QDRO. She expressed to the court her understanding that because "military retirement pay is a Federal entitlement, and not a qualified pension plan, there is no requirement that a Qualified Domestic Relations Order (QDRO) be used."

9. Lisa's reference to "gross" retired military pay is obviously intended as synonymous with "disposable retired pay"—a use and intention we share in this opinion.

However, the well-intentioned language following the highlighted word "DENIED" clearly indicates that, to some degree, Guy's motion was successful since the family court interpreted the decree just as Guy sought in his motion that it be interpreted—defining Lisa's entitlement to Guy's retired pay as excluding "any portion of [Guy's] retirement benefit attributable to [Guy's] post-divorce increases in rank and pay[.]" The family court's implicit acknowledgment of the need for such clarification suggests to us that Guy presented a *prima facie* case under CR 60.02(f). *See Rasnick v. Rasnick,* 982 S.W.2d 218, 221–22 (Ky.App.1998). Still, we must apply the three factors as outlined in the standard of review. We believe all three factors weigh in Guy's favor.

### Inapplicability of CR 60.02(a)—(e)

The family court's order effectively, albeit generally, addresses the first factor. Suffice it to say that Guy did not assert, and nothing supports an assertion, that the decree was a result of mistake, inadvertence, surprise or excusable neglect. CR 60.02(a). Nor did the decree result from perjury or false evidence, or fraud affecting the proceedings. CR 60.02(c), (d). No new evidence was discovered, nor has the judgment been satisfied, released, discharged or superseded, nor can we say that "it is no longer equitable that the judgment should have prospective application." CR 60.02(b), (e); *see also Raisor v. Burkett,* 214 S.W.3d 895, 907 (Ky.App.2006)(Kentucky appellate courts "have reserved that phrase [at the end of CR 60.02(e) ] for judgments, such as those granting an injunction, that involve the supervision of changing conduct or conditions and are thus provisional and tentative." Citations and internal quotation marks omitted). Because subsections (a) through (e) do not apply, the first factor is satisfied.

### Lack of Fair Opportunity to Present Claim

Rather than specifically addressing the second factor for showing a right to relief under CR 60.02(f), the family court instead turned to the merits of Guy's argument—whether the decree should be amended. We will address those merits *infra,* but first we address this second factor—whether Guy "had a fair opportunity to present his claim at the trial on the merits[.]" *Bethlehem, supra.*

■ The "trial on the merits" in this case was the hearing before the DRC. As noted, notice of the motion to set that hearing was not mailed to Guy at the address he had on record with the court clerk. Even if Guy had received Lisa's motion to set the hearing, he was never notified that the final hearing itself would actually take place on March 30, 1999. And there is nothing in the record that any consideration was given to having Guy participate telephonically. Additionally, we do not have a recording or transcript of that hearing because Lisa waived it without Guy's acquiescence. Therefore, we cannot determine whether the DRC properly assigned to Guy the nonmarital portion of his retired pay before recommending dividing it as he did. Even if he did, the effect of the decree is that he did not, thereby depriving Guy of his claim to that nonmarital portion. It also appears that the failure in this regard was not corrected when Lisa's attorney prepared the decree for entry by the circuit court.

Consequently, we agree with Lisa—although perhaps for different reasons—that "[i]t is important to note that Guy did not appear at the March 30, 1999 hearing of this matter before the Domestic Relations Commissioner." (Appellee's brief, p. 2). Guy cannot be blamed for his failure to

appear. Unintentional as it no doubt was, Guy lacked a "fair opportunity to present his claim at the trial on the merits" and, therefore, the second factor favoring the grant of relief under CR 60.02(f) is satisfied.

### Relief Not Inequitable to Others

■ The third factor in the analysis requires a consideration of whether the granting of CR 60.02(f) relief would be inequitable to other parties, in this case, Lisa. Granting relief to Guy would be inequitable to Lisa only if that relief deprives her of rights or property to which she is entitled. The family court, in its September 4, 2007 order, has already effectively held that Lisa is only entitled to a share of the marital portion of Guy's right to retired pay and Guy does not seek more than that. Therefore, granting CR 60.02(f) relief to Guy will not be inequitable to Lisa. We thus resolve the third factor in favor of granting the relief.

We conclude that the Madison Family Court, to the extent its September 7, 2007 order denied Guy relief pursuant to CR 60.02(f), abused its discretion. The explicit language of the court's September 7, 2007 order following that denial (regarding the limitations on what Lisa should receive) conflicts with the explicit language of the decree; therefore, the decree must be corrected.

### DIVISION OF THE MILITARY RETIRED PAY

The record is clear that DFAS is interpreting the decree's language in a manner that is not supported by this record or by Kentucky law. The record shows a number of things relevant to this appeal: (1) the parties' marital property other than the retired pay was divided before the petition was filed; (2) there being no contrary indication, the only reasonable inference to be drawn therefrom is that the division of property other than Guy's retired pay was in "just proportions" as that term is used in KRS 403.190(1); and (3) that until September 4, 2007, the record makes no distinction between the marital and nonmarital portions of Guy's military retired pay.

Additionally, to a casual or lay observer, the language of the 1999 decree appears to be consistent with what Guy sought when he responded to Lisa's divorce petition.[10] However, when Guy realized how much retired pay DFAS would be sending to Lisa and to him, shortly before he retired in 2005, then and only then did he realize that something had been lost in translation. His request for a just division of his retired pay was ostensibly acceded to by the DRC; it was presumably accurately put into the words of the decree by Lisa's attorney; the decree was entered in reliance upon those words by the circuit judge; the language of the decree was abbreviated to an unqualified raw percentage on the DFAS form by Lisa; and that percentage was acted upon by DFAS. The result was not at all what Guy had intended or expected. Only after this sequence was completed could anyone have known that the effect of the language in the decree would be that Lisa would receive the equivalent of 82%[11] of the marital portion of Guy's retired pay. Promptly after learning this, Guy contacted legal counsel to

---

10. Guy's response sought to "award Petitioner 46% of Respondent's retirement benefit per the Kentucky Guidelines;" the decree stated the "petitioner is awarded 46% of the respondent's retirement benefit from the United States Military."

11. The Madison Family Court accurately determined this percentage in its September 4, 2007, order.

seek the Madison Family Court's assistance in correcting this error.

■ In retrospect, it is easier to see how this situation was created. It occurred because neither the DRC's recommendation, nor the decree, made any explicit distinction between the marital and nonmarital portions of Guy's military retired pay. This is problematic since property division in a dissolution action first "requires a trial court to assign each spouse the nonmarital property belonging to him or her. The court may divide marital property between the parties *only* after that assignment." 15 Louise E. Graham & James E. Keller, *Kentucky Practice—Domestic Relations Law* § 15:1 (3rd ed. 2008) (emphasis supplied), citing KRS 403.190(1).

Because the decree does not *explicitly* follow this sequence, we are left with only four possibilities as to what the decree intended:

(1) the court intended to disregard the distinction between marital and nonmarital property, and purposely awarded Lisa 46% of the marital portion and 46% of the nonmarital portion of Guy's retired pay;

(2) the court implicitly followed the sequence of first assigning Guy the nonmarital portion of his retired pay, intending to award Lisa 82% of the marital portion and 0% of the nonmarital portion of Guy's retired pay (as the Madison Family Court indicates was the intent in its September 4, 2007 order);

(3) the court implicitly followed this sequence, intending to award Lisa 46% of the marital portion and 0% of the nonmarital portion of Guy's retired pay; and

(4) in accordance with Guy's understanding, as expressed in the memorandum supporting his CR 60.02 motion, "that he was giving [Lisa] 46% of his retirement benefit that he had earned up to the point of divorce, but not what he earned after the divorce," which would include 46% of the marital portion as well as 46% of the nonmarital portion earned before their marriage.

■ The first interpretation is contrary to law. Lisa is not entitled to share in any of the nonmarital portion of Guys' retired pay. *See Foster v. Foster,* 589 S.W.2d 223, 225 (Ky.App.1979)(non-pensioner spouse "not entitled to share in any pension benefits earned after divorce and before retirement[.]"); *McGinnis v. McGinnis,* 920 S.W.2d 68, 71 (Ky.App.1995)("value of a pension, if any, should therefore be marital property for the portion accrued during coverture"), quoting *Poe v. Poe,* 711 S.W.2d 849, 855 (Ky.App.1986). Since we presume the lower court followed the law, *see Hilen v. Hays,* 673 S.W.2d 713, 717 (Ky.1984), we conclude the decree did not intend to award Lisa 46% of the entirety of Guy's military retired pay, nonmarital and marital alike.

The second interpretation is neither logically possible nor supported by the record. The family court calculated that "Lisa's 46% of the entire benefit equals a robust 82% of the marital portion of the benefit." If the lower court intended to award Lisa 82% of the marital portion, why were those words not used? The fact is that the family court arrived at this percentage by a calculation only possible in hindsight, after the total number of months of Guy's military service became known, by applying the formula in *Poe, supra.*

Retracing the family court's calculation, we know that the court determined that 56% of Guy's total retired pay is marital since Guy served 295 months during which the parties were married 166 months (166 ÷ 295 = 56%). Lisa's receipt of 46% of the total retired pay, so goes the calculation, is equal to her having been awarded

82% of the marital portion (46% ÷ 56% = 82%). Despite the family court's well-meaning suggestion that this was the lower court's original intention, there are significant reasons why this could not be.

■ In order to justify an unequal division of the marital portion of military retired pay, particularly one as lopsided as 82%–18%, the record must support it. That is, the record must show that but for an unequal division of the military retired pay the overall division of the marital estate would not be in just proportions. *See* KRS 403.190(1). When Lisa filed her petition, she told the court that "[m]arital property has already been divided, except for Respondent's retirement plan through the military." One can only conclude from this language, combined with the utter absence of any contradictory indication in the record, that the parties divided the balance of the marital estate in what they perceived as just proportions. Absent the parties' agreement to divide the marital portion of Guy's military retired pay in some other way, the military retired pay should have been divided equally.[12] Any other division would have made the overall division of marital property unjust.

More significantly, absent unnatural powers of prescience, the circuit court could never have intended to award Lisa 82% of the marital portion of Guy's military retired pay. Such intent would have required the lower court to know in April 1999 that Guy would retire in November 2006 rather than on his first date of eligibility in April 2001. To illustrate the point, we need merely perform the same calculation, but using different hypothetical dates for Guy's retirement.

If Guy had retired immediately upon his eligibility in April 2001 (after 240 months of service), the marital portion of Guy's military retired pay would have comprised only 69% of Guy's total military retired pay (166 ÷ 240 = 69%), and 46% of his total retired pay would have been a "less-robust" but still substantial 66.67% of the marital share (46% ÷ 69% = 66.67%). On the other hand, if Guy had remained in the military for 35 years, as was possible given his age upon enlistment, the marital share of the total military retired pay would have been 39.5% of the total retired pay (166 ÷ 420 = 39.5%), and 46% of that would have been beyond robust—it would have equaled an award to Lisa of 116% of the marital share of Guy's retired pay (46% ÷ 39.5% = 116%). Clearly, this is a legally impermissible result.

If a service member has not yet become eligible for retirement, any division of the *gross* retired pay will mean that the percentages of the nonmarital and marital portions will shift over time subsequent to the decree. The nonmarital percentage of the retired pay will necessarily increase and the marital portion decrease. Therefore, absent the service member's agreement, such a division will necessarily become unjust as a function of mathematics.

If the decree in this case intended to grant Lisa 46% of Guy's gross retired pay (and we do not believe it did), it failed to take into account the fact that Guy's nonmarital portion of that pay increased over time as a percentage of the gross retired pay. The effect, using the family court's calculation from the September 4, 2007 order, was that Lisa's share of the marital portion of Guy's retired pay increased by more than 3% for each year Guy stayed in the military after he became eligible to

---

**12.** Because the remainder of the marital estate was already divided in just proportions, an equal division of this final marital asset is the only way, on this record, to assure that those just proportions are maintained.

retire. Therefore, we reject the notion that by awarding Lisa 46% of Guy's gross retired pay, the real intent of the decree was to award Lisa 82% of the marital portion and 0% of the nonmarital portion of Guy's retired pay.

The third interpretation of the court's intent is, so far, the most plausible. As it should, the third interpretation presumes that the DRC and Madison Circuit Court *implicitly* assigned the nonmarital portion of the retired pay to Guy before dividing the marital portion. If the court intended to award Lisa 46% of the marital portion only, this would be more consistent with the record in that it is a closer approximation of an overall equitable distribution of the marital estate than awarding her 82% would have been. But the record again leaves us with a problem—Lisa's demand.

In her petition, Lisa demanded "[t]hat the court award [her] one half of [Guy's] retirement benefit." In the absence of a transcript of the final hearing, we must presume she did not waive her right to a division of the marital estate in just proportions. Absent any other facts, and the remainder of the division of the marital estate being in just proportions, Lisa's demand for half of the marital portion of Guy's retired pay[13] should have been granted. If Lisa had been awarded 50% of the marital portion of Guy's retired pay, she would be receiving, based on the *Poe* formula, approximately 28% of Guy's retired pay[14] and not 46%. If there were

not a fourth possible interpretation, this clearly would be the proper outcome.

The fourth interpretation is urged by Guy and by what he understood was intended. He believed he was "giving [Lisa] 46% of his retirement benefit that he had earned up to the point of divorce, but not what he earned after the divorce." In effect, he waived his claim that the retired pay associated with his four years of service prior to marrying Lisa was nonmarital. Clearly, those four years of service *do* represent a *nonmarital* interest; it is, however, possible to waive the right to claim them as such. On the other hand, his waiver appears to have been conditioned upon Lisa receiving only 46%, and not 50%, of all the service credit toward retired pay accumulated prior to the divorce. If we assume Lisa agreed to those terms at the hearing and add his 49–month period of premarital service to his 166–month period of marital service, and then multiply the fraction by 46% instead of 1/2, we see that Lisa would be entitled to approximately 33.5% of Guy's total retired pay[15] and not 46%.

We have eliminated the first two interpretations as erroneous for the reasons stated. Because Lisa waived recording of the final hearing, we cannot know whether the third interpretation or fourth interpretation is the correct one. If Lisa accepted 46% of only the marital portion of Guy's military retired pay, she is entitled to receive approximately 28% of Guy's retired pay, plus proportional cost-of-living in-

13. We do not interpret the demand in Lisa's petition as seeking any part of Guy's nonmarital entitlement, or any more than she is entitled to receive under KRS 403.190(1) or as supported by the facts in this record.

14. Applying the factors in *Poe*, the equation would be: $166/295 \times 1/2 = 166/590 = 28\%$. Of course, proportional cost-of-living increases would be included, consistent with *Poe*, but these would automatically be included be-

cause Lisa's percentage share would increase proportionately when cost-of-living increases are added to Guy's gross or disposable retired pay.

15. Applying the major factors in *Poe*, and replacing 1/2 the factor with 46/100 to represent 46%, the equation would be: $49 + 166/295 © 46/100 = 9,890/29,500 = 33.5\%$.

creases that would be automatically included by DFAS. If instead she accepted the conditional waiver Guy proposed—that she receive only 46% of the marital portion and the nonmarital portion Guy earned prior to marrying her, she would be entitled to approximately 33.5% of Guy's retired pay, plus proportional cost-of-living increases. Whether it is one or the other, the Madison Family Court must determine.

Upon remand, the Madison Family Court may be called upon to address whether Lisa, to use that court's wording, was "receiving any portion of [Guy's] retirement benefit attributable to [Guy's] post-divorce increases in rank and pay," and whether she is entitled to retain those sums.

As the Madison Family Court acknowledged in its September 4, 2007 order, DFAS has prepared a pamphlet entitled *Uniformed Services Former Spouses' Protection Act, Dividing Military Retired Pay*[16] in an attempt to assist state family law courts. The pamphlet was not available when the decree in this case was entered. Had it been, the errors occurring in this case might have been avoided. However, the Madison Family Court may find it of value in resolving the remaining issues in this case. Therefore, we note some of its particularly helpful aspects.

The pamphlet provides recommendations for language in court orders and decrees that will assure a proper division of the marital portion of a service member's military retired pay. The recommended language described as the "straight percentage award," section IV.a. of the pamphlet, is perfectly suited to cases in which the military member is no longer performing military service on the date of the decree. However,

> Most of the problems with award language have arisen in cases where the parties were divorced while the member was still performing military service. In these cases, the former spouse's award is indeterminate at time of divorce since the member has not yet retired. Since the parties do not know how much longer the member will remain in military service after the divorce, a straight percentage award may not be suitable.

*Id.* at p. 7. Although the quoted language describes the situation in this case, the decree language and the form Lisa completed were intended to be used in circumstances that justified a "straight percentage award." Because Guy was not eligible at the time the decree was entered, the straight percentage award was inappropriate.

According to the DFAS pamphlet, there are three approaches[17] to the division of military retired pay of an as-yet-ineligible

---

**16.** The current version of the pamphlet is available at the DFAS website, and can be directly accessed at http://www.dfas.mil/militarypay/garnishment/Speech5.pdf.

**17.** The simplest approach, referred to as a "formula award," involves no hypothetical variables at all and allows the non-military spouse to share in post-divorce increases in rank and pay. This approach is inapplicable in Kentucky because *Poe, supra,* does not allow the non-military spouse to share in post-divorce increases in rank and pay. *Poe* at 851(we divide "the disposable retired or retainer pay which would be payable to [the

service member] if he retired at the same rank and basic pay rate which he had attained as of [the date of the decree]"). Of the two "hypothetical awards," the second is also inapplicable in Kentucky; it is appropriate in jurisdictions, unlike Kentucky, which require determination of "a hypothetical retired pay amount using the pay table in effect at the time the member becomes eligible to receive military retired pay, instead of the pay table in effect at the time the court divides military retired pay." *Dividing Military Retired Pay,* p. 11.

service member. The one consistent with Kentucky law is in section IV.c. and is the first of the so-called "hypothetical awards."

A hypothetical award is an award based on a retired pay amount different from the member's actual retired pay. It is usually figured as if the member had retired on the date of separation or divorce. Many jurisdictions use hypothetical awards to divide military retired pay. Unlike a formula award, a hypothetical award does not give the former spouse the benefit of any of the member's pay increases due to promotions or increased service time after the divorce.

. . . .

The hypothetical retired pay amount is computed the same way as the member's actual military retired pay, but based on variables that apply to the member's hypothetical retirement date. **These variables must be provided to us in the applicable court order. Failure to do so will cause the court order to be rejected.** *The court order must provide: 1) the hypothetical retired pay base, and 2) the hypothetical years of creditable service (or reserve points, in the case of a reservist).* The principal problem we find with hypothetical awards is that one or more of the necessary variables for the hypothetical retired pay computation is often left out of the court order. If we are not able to compute a hypothetical retired pay figure from the information provided in the court order, the parties will have to have the court clarify the award.

. . . .

Basic pay tables are available at the DFAS Web site at http://www.dfas.mil/militarypay/militarypaytables.html. Attorneys should be able to obtain the basic pay figure either from the member or from the applicable pay table.

. . . .

We will convert all hypothetical awards into a percentage of the member's actual disposable retired pay. . . .

This converted percentage is the former spouse's award, and would be set up in the retired pay system. While the percentage number has been reduced, the amount the former spouse would receive is the correct amount intended by the court. . . . This percentage would be applied each month to the member's disposable retired pay to determine the amount the former spouse receives. The former spouse will automatically receive a proportionate share of the member's cost of living adjustments (COLAs).

*Id.* at pp. 8–10 (Bold in original; italics and underlining supplied).

Appellate opinions from courts in Alaska, Wyoming and Indiana have adopted this pamphlet for use by their family courts. *Tillmon v. Tillmon,* 189 P.3d 1022, 1031–32 fn. 33 (Alaska 2008); *Crayk v. Glover,* 176 P.3d 645, 647 (Wyo.2008); *Cope v. Cope,* 846 N.E.2d 360, 363 (Ind. App.2006); *see also Hart v. Hart,* No. CVA07–009, DM0332–98, 2008 Guam 11, 2008 WL 2955047, at *5 (Guam Terr. July 28, 2008). In *Kelly v. Kelly,* 78 P.3d 220 (Wyo.2003), the Wyoming Supreme Court incorporated in its opinion the entire 13-page pamphlet. *Kelly,* Appendix I, at 224–231. Because it is entirely consistent with the formula in *Poe,* this pamphlet, properly considered, can be a useful alternative for family courts.

Finally, we do not find Lisa's arguments for affirming persuasive. Repeating them from her response to the motion, those arguments are (1) that Guy failed to hire an attorney to represent him during the dissolution, (2) that he failed to appeal the decree, and (3) that he waited six-and-one-half years to object to the decree's language.

Although Guy chose to forego representation by a lawyer in the dissolution, he was under the protection of the Soldiers' and Sailors' Civil Relief Act of 1940 (the "Act").[18] The Act "is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner,* 319 U.S. 561, 575, 63 S.Ct. 1223, 1231, 87 L.Ed. 1587 (1943). Even where the service member does not seek a stay of the proceedings, the Act requires that before going forward the trial court has first "determined that the military service of the appellant would not have a material, adverse effect upon his rights[.]" *Cooper v. Roberts,* 722 S.W.2d 910, 911 (Ky.App.1987). In hindsight, it is clear that Guy's lack of an opportunity to present his claim to his retired pay at the final hearing did have a material, adverse effect upon his rights. It is impossible to know whether a clearer decree necessarily would have resulted if Guy had the opportunity to present his claim. However, we cannot ignore the facts that the proceeding was not stayed, that Guy did not receive notice of the final hearing and therefore was deprived of the right to participate, that Lisa waived recording of the hearing while Guy did not, and that the decree was entered without first explicitly assigning to Guy his nonmarital portion of the retired pay.

Guy's failure to appeal the decree does not prejudice him here. As noted earlier, the decree appeared on its face to accomplish what Guy sought. This is why CR 60.02(f) was the proper vehicle to correct this error.

We also do not agree that Guy was dilatory in pursuing a change in the language of the decree. The effect of that language (awarding Lisa 82% of the marital portion of Guy's retired pay) was not made manifest until shortly before he retired in 2005 when DFAS informed him that Lisa was seeking 46% of his total retired pay and not just the portion attributable to his service prior to entry of the decree. He promptly hired counsel at that point and diligently pursued resolution. Lisa did not respond to the CR 60.02 motion for well over a year, during which time she asked the court to pass the motion more than once, and represented to the family court that the parties were working on an agreed order. Guy was not dilatory.

Having considered the parties' arguments and the record, and for the foregoing reasons, the Madison Family Court's September 4, 2007 order denying Guy's motion for CR 60.02(f) relief is vacated, and this matter is remanded to that court for further proceedings consistent with this opinion.

CLAYTON, Judge, concurs.

KELLER, Judge, concurs in result only.

**18.** Reference to the Act here is to the version in effect on the date of entry of the decree, 50 U.S.C.App. § 501 *et seq.* (1999). The Act has since been amended and renamed the "Servicemembers Civil Relief Act."